Appeal by Leonard A. Higgins, plaintiff, from a summary judgment for the defendants, Wal-Mart Stores, Inc., and H. David Clark, and from the denial of consent to file a second amended complaint, in plaintiff's action based upon allegations of malicious prosecution, abuse of process, and false arrest. We reverse and remand.
 I. The Summary Judgment.
The trial court's order on summary judgment disclosed that court's consideration of the following material:
 "All discovery, affidavit of Leonard A. Higgins, deposition of Leonard A. Higgins, deposition of H. David Clark, deposition of Wal-Mart Stores, Inc., affidavit of Annette Hardy with attachments, affidavit of Ronald Stokes with attachments, the handwritten statement of H. David Clark, the deposition of Dexter Wilson, the deposition of Greg McCoy, answers to interrogatories filed by the plaintiff, the affidavit of H. David Clark, the case action summaries of State of Alabama vs. Leonard Albert Higgins, the State of Alabama vs. Dexter Norman Wilson, and the State of Alabama vs. Greg McCoy and a certified copy of the Grand Jury indictment of Leonard Albert Higgins.
 "Further, by agreement of the parties made during the arguments on the motion for summary judgment, the Court has considered the trial transcript from the case of State of Alabama vs. Leonard A. Higgins."
Plaintiff's complaint stated causes of action against Wal-Mart and Clark in malicious prosecution, abuse of process, and false arrest.
Summary judgment is appropriate only when the moving party has demonstrated that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Kutack v. Winn-Dixie Louisiana, Inc., 411 So.2d 137
(Ala. 1982). Thus, the trial court's task was to test the elements of each cause of action against the material before it to determine whether any genuine issues of material fact existed. *Page 768 
The elements of malicious prosecution are: (1) the institution or continuation of original judicial proceedings, either civil or criminal; (2) by, or at the instance of, the defendant; (3) the termination of such proceedings in plaintiff's favor; (4) malice in instituting the proceedings; (5) want of probable cause for the proceeding; and (6) the suffering of injury or damage as the result of the action or prosecution complained of. Evans v. Alabama Professional HealthConsultants, Inc., 474 So.2d 86 (Ala. 1985), citing Turner v. J.Blach Sons, 242 Ala. 127, 129, 5 So.2d 93, 94 (1941).
The elements of an action for abuse of process are: (1) malice, (2) the existence of an ulterior purpose, (3) an act in the use of process not proper in the regular prosecution of the proceedings, Tapscott v. Fowler, 437 So.2d 116 (Ala. 1983), and (4) want of probable cause. Tarver v. Household Finance Corp.,291 Ala. 25, 26, 277 So.2d 330, 333-34 (1973).
Similarly, in a cause of action for false arrest, a plaintiff must prove that the defendant caused him to be arrested without probable cause. As pointed out in Brinegar v. United States,338 U.S. 160 at 175, 69 S.Ct. 1302 at 1310, 93 L.Ed. 1879
(1949):
 "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved."
Thus, for a detention to be valid, the officer must reasonably, and in good faith, suspect the individual detained of being involved in some form of criminality. Fennell v. State,51 Ala. App. 23, 282 So.2d 373, cert. denied, 291 Ala. 778,282 So.2d 379 (1973). Reasonable ground for belief of guilt, or probable cause, "exists where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Fennell, 51 Ala. App. at 29, 282 So.2d at 378.
As applied in malicious prosecution actions, probable cause is "such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty." Birwood Paper Co. v. Damsky, 285 Ala. 127,134, 229 So.2d 514, 521 (1969). And, as stated in S.S. KresgeCo. v. Ruby, 348 So.2d 484, 488 (Ala. 1977):
 "The question in an action for malicious prosecution arising from a criminal charge is whether the defendant, at the time he or she instituted the prosecution, had probable cause to believe that the accused was guilty." (Emphasis added.)
Notwithstanding these rubrical principles, the existence or non-existence of proximate cause is a jury question "if the facts or any necessary particular fact on the issue of probable cause is in dispute." Key v. Dozier, 252 Ala. 631, 634,42 So.2d 254 (1949), and cases cited therein. See also NationalSecurity Fire Casualty Co. v. Bowen, 447 So.2d 133
(Ala. 1983).
The affidavit of H. David Clark was executed on February 1, 1986, after the plaintiff's action was filed. The material assertions of that affidavit follow:
 "2. I was working as a security guard for Wal-Mart Stores, Inc., at its Auburn store on or about March 5, 1984.
 "3. On that occasion, I was walking by the makeup section of the store when I observed a buggy being pushed by two males, one of whom was subsequently identified as Leonard A. Higgins, Jr. There was a large amount of merchandise in this buggy. Before I had walked very far, the buggy and the two males came by me having already checked out. I was suspicious as to the inordinately small amount of time it took for them to check out and also observed them making suspicious movements as they left the store. They were looking side to side, around at the cashiers, and behind them. *Page 769 
 "4. The buggy was pushed out by Mr. Higgins. After Mr. Higgins and the other male got outside, I sent a clerk out and requested that she look at the receipts and then ask them to come back into the store. When they got back into the store, the second male lagged behind and played like he was on the telephone. I knew that he was not because I picked up and did not hear anyone. I began questioning Mr. Higgins and the other male abut the incident. During this questioning, Mr. Higgins gave several answers which I later determined to be inconsistent statements. For instance, he advised that he did not know the Wal-Mart employee, Greg McCoy, who was working the cash register. It later turned out that he did. Mr. McCoy also gave several inconsistent statements when I questioned him."
Clark's extensive deposition established that he observed Leonard Higgins and Dexter Wilson in the pet department of the Wal-Mart store as he was making his rounds a few minutes before the incident in question. When Clark next noticed them, Wilson was standing at the electronics department looking at a camera with a store employee. Higgins was standing in an aisle in the same department looking at a portable telephone. According to Clark, Higgins placed the telephone in a merchandise cart that also contained a large bag of Purina Dog Chow and a mop. A few seconds intervened before Clark observed the two again when he checked the toy aisle near the register. Greg McCoy had replaced the electronics department employee and was talking to Wilson about the camera. As Clark, in plain clothes, walked by them, Higgins pushed the cart forward as McCoy was ringing up an item on the register. Clark did not look at the register or at the individuals when McCoy actually rang up the transaction and handed over the sales receipt. He walked down the aisle, and, he said, about 15 or 20 seconds later, he was standing at the cosmetics counter, about 10 to 15 feet from and at an angle to the register, when Wilson and Higgins walked by him. He continued:
 "A. As they passed by, it — dawned on me that they had a — a grocery — a shopping cart full of merchandise and that their time at the register was not — not more than 15 or 20 seconds. And I knew from past experience of check-outs that that type of — that length of time you couldn't get a bag of merchandise — a — a complete shopping cart full of merchandise rung up. I felt in my mind that those — that something at that time was wrong; that it took them too short of time to get that merchandise rung up, put in a bag, stapled, put back in the buggy."
Clark said he then observed both Higgins and Wilson, directly behind the buggy and side by side, walking toward the front of the store, looking at the registers and looking behind them:
 "Q. Okay. So, they're walking along; they're looking from side to side. What else did you notice?
 "A. Just the manner in which they were — they were looking. They, in my opinion, did not appear to be looking at merchandise. They — what — did what I believed to be looking for people who were noticing them. And they got —
"Q. What gave you that idea?
 "A. Just the manner of their — of their movements. They had already completed a transaction, and they were — they were moving very slowly and what I would term cautiously down the aisles.
 "Q. They had a 50-pound sack of dog food in there, didn't they?
 "A. It was in the buggy. There was no chance —
"Q. Buggy, I mean.
"A. — of it falling out.
 "Q. But I mean, in — and you say there was other merchandise in the cart?
 "A. Shopping bags. Certainly the merchandise — the — shopping cart was not full, if that's what you're implying.
"Q. Sir?
 "A. It was not completely full, overflowing to the top.
". . .
 "Q. Okay. Then, what did you see them do that was suspicious? *Page 770 
 "A. They got to the front of the store where the aisle actually going out of the store — would actually be the incoming doors — they got to it, and there was a service desk there. And the service desk had a couple of customers there. They actually stopped at the — an area just before you get to the service desk and stood there and stood there and stood there and looked towards the service desk until the service desk got some more customers up there.
 "Then, they went to the far end of the aisle way and walked down the end of the aisle way and went out the — the furthest doors going out into the vestibule past the service desk looking back towards the service desk the entire time.
 "Q. So, they were looking back over their shoulders at the service desk the entire time?
 "A. And — yes, sir, moving again what I would term 'cautiously.'
 "Q. Did one of them go up and distract somebody's attention before they pushed the cart out, or did they both stay right there with the cart?
"A. They both were right there at the cart.
". . .
 "A. They went out in the vestibule and turned and went out the doors immediately outside the vestibule where — leading into these doors. At that time, I went up to the service desk and contacted the service desk girl and told her that I needed her to go out and check their receipt."
Ms. Cindy Apgar, an employee at the service desk, left the store as requested, talked to Wilson and Higgins, and, as Clark stated, returned to the store appearing distressed. Higgins accompanied her to the door, where Clark met him, identified himself, and stated that he needed to speak to him about the situation:
 "A. He said that he didn't — he didn't know what was going on. He didn't understand what the problem was. And I walked him back towards the-the service desk. And we stopped at the service desk. I looked at the receipt. I looked at the — and the first thing I saw when I looked at the bag was the dictaphone [sic], and it had a price tag of, I think, $103 on it. And the receipt showed a price of around $3.
 "And I told him at that time that there was a problem with his receipt, and that I needed to — I needed to talk to him more about this. And he said, I don't know what's going on. You need to talk to your employee. He's the one that rang it up. I didn't do anything. I don't know what you're talking about.
"Q. Okay.
 "A. I said, what about the other gentleman involved? He said, I don't know him. I just came up here with him.
"Q. Just came up here with him?
"A. That's what he said.
". . .
"Q. So, what did you do then?
 "A. I went back there and contacted Greg McCoy, and I told him that I needed to see him up front about a problem with one of the tapes. And he asked what the problem was. And I told him. He said — and I showed him the tape. He said that he just rang up the items that were in the bag. He didn't know anything else about anything. And I — and I told him at the time, I said, Greg, there was a phone and a camera and some other items that I can see in that bag. He said, well, I don't know anything about that. They must have put that in the bag after I rang them up.
 "So, at that point, I brought him up there to talk with him further. Kept — kept those two gentlemen together and went out to get Dexter Wilson.
"Q. Okay. So, what did you find out then?
 "A. Dexter Wilson was out past the vestibule out into the sidewalk area standing with a headpiece of a phone to his ear.
"Q. Was it a pay phone or something?
"A. Yes, sir, a pay phone. And I —
"Q. What happened then?
 "A. He was talking into the pay phone. I contacted him and told him who *Page 771 
I was, what my position with the store was, and what the — I needed to speak to him about, and that he needed to come back inside. And he asked why, and I told him what I needed — there was a problem, that I needed to see him inside.
 "And he just dropped the phone where it was at. As he stood there, I picked the phone up, listened to it, didn't hear any voice on the other end and hung it up, and noticed that there was a coin drop in the phone. I didn't hear the coin drop as if a — a call had been completed. And we walked back inside, and I explained to him the situation. And he said, I don't — I asked him did he know Greg Wilson. He said, I don't know —
"Q. Greg McCoy?
 "A. Greg McCoy. Excuse me. I don't know him. I don't know anything about it. That's — this is between you and your employee. I said, no, sir. I said, it's a problem that we need to get collect — corrected and cleared up. And I said, I believe that your statements are conflicting each other, and that I need to go ahead and contact the police and let's investigate this further. And at that time —
 "Q. When did you take them to the back? Is that when you took them to the back?
 "A. Yes, sir. They were all taken to the back. Seated in the back office. And at that time, I called the Auburn Police Department and advised them that I had three individuals that I had believed, due to the price and the amount of the theft, had committed a felony, at which time they sent three officers out there. And they took them back to the police department and started their investigation."
Clark proceeded to fill out some company reports, for which he obtained the names and addresses of the three persons detained prior to the time the police arrived. He went to the police department, related the event to a detective, and remained there throughout the police investigation, which included police interrogation of each person. Clark sat in the room while each person was questioned. According to Clark, although Higgins denied any involvement, Wilson gave two written statements:
 "The first one denying any knowledge of Greg McCoy and Leonard Higgins's involvement in it and his involvement in it. And the second time, I — was when he acknowledged that he knew Greg McCoy and that he — he did, in fact, play a part in this crime; and that he, in fact, told — told Leonard Higgins that they were — they could go down to Wal-Mart and get merchandise for less than the amount — less than the amount they were going to pay.
 "Q. Okay. Now, I understand you weren't there in the room when Dexter gave that?
"A. Yes, sir.
 "Q. But did you hear him telling the officer that in —
"A. Yes, sir.
"Q. — response to a question?
 "A. That's — in his questioning, that's what was — what was told. And when it was put to writing, I naturally — I put — I wrote my own statement out while they were actually penning it.
"Q. That was all the night of March the 4th?
"A. Yes, sir.
 "Q. Okay. Now, you've told me what Dexter said there on the night of March 4th.
"A. Yes, sir.
 "Q. And — and you heard him say those things you just said —
"A. I certainly did.
"Q. — to the police officer there. . . ."
Clark was also present when McCoy was giving his statement to the police:
 "A. At first Greg denied any knowledge of what had happened. Then, he gave some conflicting statements which Detective Quenelle was able to go in and confront the other individuals on and then confront Greg McCoy on his — on what he had been told by the others. And Greg McCoy finally broke down and gave his confession as to his involvement on it and implicated his — his — his roommate *Page 772 
at the time, which was Dexter Wilson. And he said he had no knowledge of Leonard Higgins even being — even coming down to the store with —
"Q. Okay.
"A. — Dexter Wilson.
 "Q. So, the statement that — that Greg McCoy gave there on the 4th said he had no knowledge of Leonard's involvement. Is that —
 "A. He had no knowledge of his coming into the store. He didn't know whether he was involved or not."
The McCoy statement, in which McCoy implicated Wilson, was as follows:
 "My name is Greg McCoy. I am a student at Tuskegee Institute. I work at Wal-Mart in Auburn. I am making this statement with full knowledge of my rights, and I waive those rights. I can read and write the English language. Last week my roommate, Dexter Wilson, and I got a lot of bills in. We needed money badly so I told Dexter we could steal a camera from the store and sell it. Today 3/4/84 I went to work at Wal-Mart at 1:00 p.m. I asked Dexter if he was going to come up to the store. This was the first day I had worked since we talked about the camera. Dexter came up to the store while I was on break at about 3:30 p.m. He had Lenny [Higgins] with him. I don't know if Lenny knew anything about this. I took the camera and the phone and pretended to ring them up. I only rung up about $2.84 on the register. I knew this was wrong. I knew we were stealing. But we needed the money. This is a true and correct statement to the best of my knowledge."
Although Clark testified that Wilson implicated Higgins, Wilson denied making any statement on the night the interrogations occurred. No such statement of Wilson was introduced at Higgins's subsequent trial and none is contained in the record.
The following day, March 5, 1984, Clark signed an arrest warrant against Higgins which charged him with theft of property in the second degree.
On April 5, 1984, Wilson and McCoy pleaded guilty to theft of property in the second degree. Subsequently, the Lee County grand jury, after Clark had testified before it that Wilson had implicated Higgins in the "under-ringing" scheme, which implication Wilson denied, indicted Higgins on a charge of theft of property in the second degree. Higgins pleaded not guilty, and, at his trial by jury on that indictment, he was found not guilty, and this action for malicious prosecution, abuse of process, and false arrest ensued.
Perusal of Clark's statements made in connection with the summary judgment motion discloses that the following facts were material to the defendants on the issue of probable cause:
Clark was suspicious of the motives and conduct of Wilson and Higgins because of what he considered to be the small amount of time it took for them to check out at the cash register;
Clark's suspicions were further aroused because of the movements of Wilson and Higgins, i.e., hesitating, looking at the registers, looking from side to side, and looking behind them;
Clark's suspicions were enhanced because Wilson did not return to the store with Higgins, but, in Clark's opinion, pretended to use a telephone; and
Clark's statement that Higgins told Clark that he did not know Greg McCoy.
Each of these postulations, however, is directly contested. Higgins's affidavit submitted in opposition to summary judgment contains the following:
 "2. On Sunday, March 4, 1984, I was a student at Tuskegee Institute School of Veterinary Medicine and I was studying for an examination. Dexter Wilson called me and asked if I wanted to go to Wal-Mart in Auburn. I told him that I had no money, but that I needed a sack of dog food and a mop. I asked him to buy the dog food and mop for me and I agreed to pay him back when I got my money.
 "3. Dexter Wilson never told me about any scheme that he had going with *Page 773 
Greg McCoy to take property from Wal-Mart without paying for it. We discussed nothing of that sort.
 "4. When we arrived at the Wal-Mart store, I entered, got a shopping cart and proceeded to load up the dog food and the mop. Then I proceeded to the electronics department and looked at the televisions and stereos while Dexter was talking to a Wal-Mart employee at the counter. The employee was not Greg McCoy. I did not touch any telephone while in the electronics department or anywhere else in the store on that day and I did not place any telephone in the shopping cart. Dexter Wilson came over to where I was and we pushed the cart up to the counter where Greg McCoy was now manning the register.
 "5. I walked away from Greg and Dexter down to the end of the aisle and looked at some albums and film container information while the goods were being checked out by Greg McCoy. I saw Dexter hand Greg some bills but I heard nothing of any conversation between Greg and Dexter. I did not see the cash register receipt and I had no knowledge of the price that the receipt reflected. Dexter Wilson's parents are wealthy and I was not surprised that he could buy whatever items he desired.
 "6. Dexter and I then left the electronics department and pushed the cart down the aisle toward the exit. We did not proceed slowly or cautiously and we did not look back over our shoulders to see if someone was looking at us and we did not look at the cashiers and we did not look from side to side in a suspicious manner. We proceeded down the aisle pushing the cart without looking for anyone, paying attention to anyone or doing any other physical movement other than avoiding people walking in our path and obstacles in our way.
 "7. Dexter and I did not stop near the service desk to wait for people to gather around the service desk before we exited. We did not even slow up at the service desk. We proceeded out the door without looking back at the service desk or without looking over our shoulders. We did not look back at the service desk or over our shoulders at anything or anyone as we proceeded out of the store.
 "8. We pushed the cart out to the car and began to unload it into Dexter's car. Ms. Cindy Apgar, a Wal-Mart female employee, came out and asked us to come back in to check the ticket at the service desk. I placed the packages back in the cart and pushed the cart back with Ms. Apgar as she requested directly into the front of the Wal-Mart store. Dexter Wilson did not come with us at that time although I was unaware that he was lagging back until we reached the inside of the store.
 "9. Inside the store, Mr. David Clark told me that the receipt did not match the merchandise. I told him that I did not know anything about that because I didn't pay for it and that he had better ask Dexter, who had paid for it. It was at that time that I first realized Dexter Wilson was not inside the store with me. I told Mr. Clark and the police repeatedly that I did not know anything about any scheme to steal from Wal-Mart or under-ringing and that they should talk to Dexter or Greg McCoy. I never admitted knowing anything about the scheme because I didn't know anything about the scheme.
 "10. I did not tell Mr. David Clark at the front of the store or in the back of the store or any other time that I did not know Greg McCoy. Mr. Clark never asked me if I knew Greg McCoy. I never denied knowing Greg McCoy."
Additionally, Wilson denied giving any statement to anyone that implicated Higgins in the "under-ringing" scheme.
Clark, moreover, testified by deposition that the item he saw Higgins put into the shopping cart was a cordless telephone. However, Higgins consistently denied placing any telephone in the cart, or even handling a telephone.
Finally, there is Clark's account of his observations of Higgins and Wilson at the time they checked out. As previously noted, in his deposition Clark testified that it took them only 15 to 20 seconds to check *Page 774 
out and pass him some 10 to 15 feet away. Yet, Clark's own handwritten statement made only hours after the incident at the Auburn Police Department stated:
 "[S]ubjects continued to shop for several minutes then went to check out in electronics department. Greg McCoy was working the cash register. The next time I saw the black males, approximately 5 minutes later they were exiting the store by the service desk."
Thus, Clark's own statements concerning the time frame of his observation of Higgins and Wilson — the initial cause of his aroused suspicions — are in conflict.
These disputed facts, we respectfully submit, clearly make the issue of probable cause one for the jury. Indeed, on summary judgment, all reasonable inferences from the facts are viewed most favorably to the nonmoving party. Kutack, supra.
Contrary to Clark's statements, there are facts from which a jury could reasonable infer that Higgins himself took nothing, knew of no scheme, was not implicated by the others, and made no movements tending to cause reasonable suspicion. Consequently, summary judgment on the counts for malicious prosecution, abuse of process, and false arrest was improper, and the trial court erred in granting it.
 II. The Amended Complaint.
At a pre-trial conference, on June 20, 1986, the trial court entered the following schedule order: "Any amendments to the pleadings are to be filed on or before 8-14-86." (Emphasis added.) This order also set August 14, 1986, as the date for the pre-trial conference and for a hearing on "motion for summary judgment." Additionally, the order recited: "This cause is set for trial on the merits on fall term which starts9-16-86."
In compliance with the order, which remained unchanged, Higgins filed a second amended complaint on August 14, 1986,i.e., within the time allowed by the order itself. On the objection of the defendants, however, the trial court denied plaintiff permission to file the amendment.
The amendment itself purported to state a cause of action in defamation. It averred that the defendants had placed plaintiff's photograph on a bulletin board in the Auburn Wal-Mart store devoted to photographs of persons arrested for shoplifting or stealing, that it was placed there shortly after March 4, 1984, and remained there until sometime in the fall of 1984, after June 7, 1984, the date plaintiff was acquitted. Although this cause of action was different in its nature from those alleged earlier, it is clear that it arose out of the same incident. Indeed, Clark conceded that he took the picture in connection with the store program then in existence. Moreover, in view of the extensive discovery engaged in by the parties, it is highly unlikely that the defendants or their counsel were unmindful of this evidence or of its possible legal implications. Be that as it may, Rule 15(a), A.R.Civ.P., and the decisions of this Court make it clear that amendments are not to be unduly restricted, but freely allowed when justice requires. Suffice it to state here that no showing of prejudice was made, Miller v. Holder, 292 Ala. 554,297 So.2d 802 (1974), nor was there a showing of any unfair disadvantage to the defendants. Indeed, neither they nor plaintiff objected to the amendment/trial schedule at the time the scheduling order was entered, or at any time prior to the filing of the amendment. Thus, we find that the well-meaning trial court abused its discretion in denying the amendment when it was filed in compliance with the trial court's order as to the time for filing such amendments, and there was no showing of prejudice.
For the reasons stated, the judgment must be, and it is, reversed and the cause remanded for further proceedings. It is so ordered.
REVERSED AND REMANDED.
MADDOX, JONES, ALMON and SHORES, JJ., concur. *Page 775