[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 168 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 169 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 170 
Lashawna Chenice Goodman[1] sued Wal-Mart Stores, Inc., and its employee Denise Milner, alleging malicious prosecution. The jury returned a verdict in favor of Goodman, awarding her compensatory damages of $200,000 and punitive damages of $3 million. Wal-Mart and Milner filed a postjudgment motion seeking a judgment as a matter of law ("JML"), or, in the alternative, a new trial or a remittitur of damages. In partially granting this motion, the trial court found the punitive-damages award excessive and ordered a remittitur to $1 million. Goodman filed a "Motion to Alter, Amend, or Vacate the Remittitur," and, in response, the trial court reinstated the jury's punitive-damages award. The court entered a judgment based on the jury's awards.
Wal-Mart and Milner appeal, arguing that the court erred in reinstating the punitive-damages award and in denying their motion for a JML or a new trial. We affirm conditionally.
 I. Facts
On December 24, 1995, Goodman, along with her two children, went to the Wal-Mart store in Opelika. Goodman claims that the purpose of this trip was to exchange a telephone she says she had purchased at a Montgomery Wal-Mart store. She testified that when she entered the Wal-Mart store, an employee greeter affixed a sticker to the box that Goodman was carrying that contained the telephone and then instructed Goodman to go to the customer-service desk. There, she claims, the customer-service employee told her to *Page 171 
leave the telephone and the receipt at the customer-service desk, find an exchange for the telephone, and then return to the customer-service desk. Goodman contends that, finding no suitable replacement for the telephone, she returned to the customer-service desk in order to retrieve the telephone and the receipt; that she placed the telephone in the top part of her shopping cart; and that she then continued shopping in the store. Goodman claims that she made a purchase in the automotive department, where, she said, she explained to the cashier her "failed attempt at exchanging the telephone." Goodman testified that after making that purchase, she went to the toy department, then went to the pet department and there exchanged pleasantries with an acquaintance, and then finally left through the front of the store.
Goodman claims that upon exiting the store she was stopped by Milner and another Wal-Mart employee, and she says they asked her to return inside the store to show proof that she had purchased the telephone. Goodman alleges that Milner accused her of stealing the telephone. Goodman testified that she provided Milner with an explanation and with the receipt for the telephone; she claims Milner completely dismissed her explanation and the receipt. Goodman also says that upon reentering the store she asked Milner to verify her story with the employees at the customer-service desk, the cashier in the automotive department, and the employees at the store where she said she had purchased the telephone, in order to provide verification of the receipt. She claims Milner refused to do so. She testified that Milner escorted her and her two children to a back office in the store building. There, Goodman says, she retrieved her receipt and put it in her shoe. The police arrived and arrested Goodman. Goodman, who was pregnant at the time, was handcuffed and taken to jail, accompanied by her two children. She was charged with theft of property. Once at the police station, Goodman claims, she began having lower abdominal pains, which she says continued through the next day, which was Christmas. She testified that because of these pains she had to seek medical treatment. Goodman also testified that she sought treatment from her obstetrician because of the worry and stress she says she was suffering because of the arrest for the alleged theft. Further, she claims that her employer fired her from her job because he heard about her arrest over a police scanner when she was being transported to the police station.
Milner's account of the facts, however, is different. She testified that she saw Goodman take a box containing a cordless telephone from a bottom shelf in the electronics department of the Opelika Wal-Mart store. She claims that Goodman placed the box containing the telephone in the top part of the shopping cart with two Wal-Mart bags. Milner testified that she then watched Goodman as she walked through the store. She stated that Goodman first went to the domestics department in the back of the store; then to the boys' wear department; then to the lingerie department, where, Milner says, Goodman had a conversation with a Wal-Mart employee; and then back to the domestics department. Milner claims that, from there, Goodman walked through the automotive, sporting goods, and toy departments before entering a garden-center aisle; Goodman was in that aisle, Milner says, when Milner watched Goodman conceal the telephone. Milner claims that she watched Goodman take automotive merchandise out of one of the Wal-Mart bags and slip the cordless telephone into the remaining empty bag. She contends that Goodman then stopped to look at the fish *Page 172 
in the pet department and then exited the store without purchasing the telephone. Milner and another employee stopped Goodman in the parking lot and asked her to accompany them to an office in the back of the store. Milner says that when Goodman was stopped she claimed she had purchased the contents of the bags, but that later she told Milner the telephone belonged to her and that she had brought it into the store in an attempt to exchange it. Milner testified that Goodman told her she had attempted to exchange the telephone after she left the boys' wear department. Milner said she knew this was not true because she had watched Goodman leave the boys' wear department, and, she said, Goodman never went to the customer-service desk.
Milner stated that during the interview in the back office, Goodman was uncooperative, would not give Milner any information, and denied the theft. Milner testified that Goodman then presented a receipt, which had been dated a week earlier and which showed a purchase made at a Montgomery Wal-Mart store. Milner claims that she gave no credence to the receipt because she had seen Goodman take the telephone off the shelf in the electronics department and then had seen her conceal it in a bag. Moreover, she stated that because she had seen Goodman leave from the boys' wear department and exit the front of the store — not going to the customer-service desk, as Goodman claimed she had done — she was sure that Goodman had attempted to steal the telephone.
Milner testified that she asked Goodman if she wanted to make a telephone call in order to arrange for her children to be taken home. She said Goodman made three telephone calls but did not find anyone to pick up her children. The police arrived, arrested Goodman, and escorted her and her children through the store to a police vehicle parked in front of the store. Milner claims that, at that time, she confirmed with the customer-service employees that Goodman had not been at the customer-service desk to exchange the telephone.
Goodman claims that Wal-Mart employed a "quota-apprehension" system. A Wal-Mart representative testified that all of Wal-Mart's "loss-prevention associates," including Milner, must report to district supervisors the number of apprehensions made per month. This system of reporting follows to the regional supervisors, the divisional supervisors, and ultimately to the loss-prevention vice president. Wal-Mart scores its loss-prevention associates on their apprehension productivity, which is based on the number of apprehensions made by the loss-prevention associate. This score is a factor in determining raises and promotions. The regional loss-prevention associate for Milner's area testified that she tabulates the figures for her region to determine an apprehension average. On Milner's 90-day review form, Milner was described as needing improvement on her number of apprehensions per month. Milner was below average in apprehensions, and she wrote on her 90-day-evaluation form that she was going to improve the number of her monthly apprehensions.
 II. Procedural History
In March 1996, the Opelika Municipal Court found Goodman not guilty on the charge of theft. Goodman sued Wal-Mart and Milner (hereinafter referred to collectively as "Wal-Mart") in the Circuit Court of Macon County in March 1997. The complaint contained six counts, all relating to Goodman's arrest at the Opelika Wal-Mart store in December 1995; the counts alleged fraud, false imprisonment, malicious prosecution, negligent or wanton training and supervision, assault and battery, *Page 173 
and the tort of outrageous conduct. Goodman amended her complaint in June 1997 to include three new counts: libel, slander, and abuse of process.
The trial court entered a summary judgment for Wal-Mart on some of Goodman's claims. The trial court ruled that only Goodman's claims alleging false imprisonment (referred to by the trial judge as "false arrest/false imprisonment") and malicious prosecution would go to trial. On the first day of trial, February 8, 1999, Goodman voluntarily dismissed her false-arrest/false-imprisonment claim, and the case was tried solely on the claim of malicious prosecution.
At the close of Goodman's case, Wal-Mart moved for a JML, asserting that Goodman had failed to provide sufficient evidence to submit the question of probable cause and malice to the jury. The trial court denied the motion. Wal-Mart again filed motions for a JML at the close of its case-in-chief and at the close of all the evidence. The trial court denied those motions also.
The case was submitted to the jury on February 12, 1999, and the jury returned a verdict in favor of Goodman, assessing compensatory damages of $200,000 and punitive damages of $3 million. The trial court entered a judgment on the verdict. Wal-Mart filed a renewed motion for a JML, or, in the alternative, a new trial or remittitur; the trial court reduced the punitive-damages award to $1 million but denied the motion for a JML or a new trial. Goodman then filed a "Motion to Alter, Amend or Vacate the Judgment" entered by the trial court; the court granted that motion and reinstated the $3-million punitive-damages award. Wal-Mart appealed.
Wal-Mart makes several arguments on appeal: (1) that Wal-Mart was entitled to a JML on the basis that Goodman did not present, in support of her malicious-prosecution claim, substantial evidence of either a lack of probable cause or malice; (2) that Wal-Mart is entitled to a new trial (a) on the basis that Goodman intentionally destroyed evidence; (b) because of improper ex parte out-of-court testing, by Goodman's counsel, of Wal-Mart's merchandise-return procedure; and (c) based on Batson[2]
violations by Goodman's counsel in striking the jury; (3) (a) that the compensatory-damages award of $200,000 — for mental anguish — is not supported by the record, and (b) that the punitive-damages award of $3 million does not withstand review by the "guideposts" of BMWof North America, Inc. v. Gore[3] or by the factors stated in Hammondv. City of Gadsden[4] and Green Oil Co. v. Hornsby,[5] and therefore should be vacated or substantially remitted; and (4) that if this Court orders a new trial, the new trial should take place in Lee County, based on an application of the doctrine of forum non conveniens.
 III. Sufficiency of the Evidence
Wal-Mart argues that the trial court erred in denying its motions for JML because, it claims, Goodman failed to present sufficient evidence in support of her claim alleging malicious prosecution. More specifically, Wal-Mart contends that the issue whether Milner had probable cause to effect the arrest of Goodman *Page 174 
should not have been presented to the jury because, Wal-Mart argues, there is no genuine issue of material fact as to whether Milner had probable cause to believe that Goodman was shoplifting the telephone. Wal-mart also claims that Goodman, at trial, failed to produce substantial evidence on the issue of lack of probable cause. Because this appeal is from the trial court's denial of a motion for JML or a new trial, we are bound to view the evidence in a light most favorable to the nonmovant. Motion Indus., Inc. v. Pate, 678 So.2d 724,726 (Ala. 1996). Accordingly, where the evidence in the record is disputed, we consider it in a light most favorable to Goodman.[6]
In order for a claim of malicious prosecution to be submitted to a jury, the trial court must determine that the plaintiff has presented substantial evidence of the following elements: (1) that the present defendant instituted a prior judicial proceeding against the present plaintiff; (2) that in instituting the prior proceeding the present defendant acted without probable cause and with malice; (3) that the prior proceeding ended in favor of the present plaintiff; and (4) that the present plaintiff was damaged as a result of the prior proceeding.Delchamps, Inc. v. Bryant, 738 So.2d 824, 831-32 (Ala. 1999). In malicious prosecution cases, "probable cause" is defined as "such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty." Delchamps, Inc. v.Morgan, 601 So.2d 442, 445 (Ala. 1992) (citation omitted). Thus, the determination of probable cause does not hinge upon whether Goodman was in fact guilty of shoplifting, but whether Milner's subjective belief under the circumstances led her to believe that Goodman was guilty. In order to produce substantial evidence on the element of lack of probable cause, Goodman had to present evidence "of such weight and quality that fair-minded persons in the exercise of impartial judgment [could] reasonably infer the existence of the fact sought to be proved." Westv. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala. 1989).
Malice is an inference of fact, and it may be inferred from a lack of probable cause or from mere wantonness or carelessness if the actor, when doing the act, knows it to be wrong or unlawful. Bryant,738 So.2d at 833. Personal ill will or a desire for revenge is not essential for a finding of malice. Delchamps, Inc. v. Larry, 613 So.2d 1235, 1239 (Ala. 1992). However, an inference of malice drawn from the lack of probable cause may be rebutted by evidence showing that the defendant acted in good faith. Bryant, 738 So.2d at 832.
Here, the evidence was in sharp dispute. Goodman's version of the event presented a jury question as to whether a reasonably prudent person acting in good faith would have made further inquiry before prosecuting. Dean Prosser wrote, on determining reasonableness:
 "The appearances must be such as to lead a reasonable man to set the criminal proceedings in motion. The defendant is not necessarily required to verify his information where it appears to be reliable; but where a reasonable man would investigate further before beginning *Page 175 
the prosecution, he may be liable for failure to do so. All such factors as the reliability of the source, the availability of further information and the difficulty of obtaining it, the representations of the accused and his opportunity to offer an explanation, and the apparent necessity of prompt action, are to be considered in determining whether it was reasonable to act without seeking verification."
William L. Prosser, Law of Torts, § 119 at 842 (4th ed. 1971) (quoted in Atlantic Zayre, Inc. v. Meeks, 194 Ga. App. 267, 390 S.E.2d 398 (1990) (using Prosser, Law of Torts, § 119, as a basis for its rationale that a store security guard could be found to have acted unreasonably in arresting a customer: the customer had offered "over and over to give an explanation and to fetch [his] receipts [from his car], but was not permitted to."). We find the reasoning of the Court of Appeals of Georgia persuasive under the circumstances presented by this case.
The record reflects that Goodman, at the time of the apprehension, presented to Milner a receipt that matched the product code of the merchandise Goodman had allegedly concealed. Although the receipt was dated seven days before the date of the apprehension, Milner made no effort to verify its legitimacy. Before calling the police, she did not confirm with the customer-service-desk employees whether Goodman had, in fact, attempted to exchange the telephone; nor did she confirm with the store greeter whether Goodman had entered the store with the telephone. Therefore, the question whether a reasonable person acting in good faith would have investigated the situation further before proceeding with the arrest was disputed; the trial court correctly allowed the jury to decide the issue of probable cause.
 IV. Batson Violations
Wal-Mart claims that it is entitled to a new trial because, it says, Goodman's counsel, in striking the jury, violated the principles ofBatson v. Kentucky, 476 U.S. 79 (1986). Wal-Mart alleges that Goodman's counsel exercised her peremptory strikes in a racially biased manner by striking 9 of the 10 white persons from the jury venire. Goodman's counsel, while maintaining that no reversible Batson error was ever presented, argues that Wal-Mart's Batson challenge was not timely.
Generally, one making a Batson challenge to the composition of the jury must do so before the jury is sworn. Stegall v. State, 628 So.2d 1006,1008 (Ala. 1993). Additionally, a Batson challenge is untimely if it is made after the venire has been dismissed. McGregory v. Lloyd WoodConstr. Co., 736 So.2d 571, 577 (Ala. 1999). A Batson challenge made after the unselected members of the venire have been released would create the difficulty of a great delay in drawing and summoning a new venire. McGruder v. State, 560 So.2d 1137, 1143 (Ala.Crim.App. 1989).
Wal-Mart claims that before the jury was sworn the parties held an unrecorded sidebar conference with the judge, informing the judge that Wal-Mart wished to make a Batson challenge to Goodman's exercise of her peremptory strikes. Wal-Mart further claims that the trial court, in an effort to accommodate the veniremembers, who had been in court all morning, decided to hear the Batson challenge after dismissing both the jury and the unselected members of the venire. Wal-Mart contends that this was made apparent in the record by the language the trial court used after dismissing the jury for the day: "I believe a motion has been made by the defense. You can go ahead and read *Page 176 
your motion into the record." Wal-Mart claims that this statement by the court shows that Wal-Mart had made its Batson objection to the court before the court dismissed the jury and the unselected members of the venire. The court entertained a Batson challenge by Wal-Mart in the absence of the jury and the unselected veniremembers. Goodman's counsel responded with explanations for striking the white jurors. The trial court found no Batson violation in Goodman's exercise of her peremptory strikes.
This Court is limited to a review of the record, and the record cannot be changed, altered, or varied on appeal by statements in briefs of counsel. Gotlieb v. Collat, 567 So.2d 1302, 1304 (Ala. 1990). Moreover, we cannot assume error or presume the existence of facts as to which the record is silent. Alfa Mut. Gen'l Ins. Co. v. Oglesby,711 So.2d 938, 942 (Ala. 1997). The first mention in the record of any alleged Batson violation came after the trial court had dismissed the jury and the unselected veniremembers. The sidebar conference, in which Wal-Mart claims the trial court discussed entertaining its Batson
challenge, was not reported. We cannot assume facts from the record, nor can we presume that an unreported motion was timely made. We must conclude that Wal-Mart's Batson challenge was untimely. We therefore need not address whether Goodman's proffered explanations were race-neutral.
 V. Spoliation of the Evidence
Wal-Mart argues that it should be granted a new trial because, it claims, Goodman intentionally destroyed the box that had contained the cordless telephone in question and thereby caused the parties to be unable to examine the box. Wal-Mart claims the box would have shown whether Goodman had in fact brought the telephone into the Opelika Wal-Mart store. Wal-Mart argued that a "greeter label" would have been affixed to the box when Goodman entered the store. Once the "greeter label" was taken off, Wal-Mart claims, it would have left an impression of the word "VOID." Therefore, Wal-Mart says, the trial court would have been able to determine if Goodman had actually entered the store with the box.
Spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party's adversary. May v. Moore, 424 So.2d 596,603 (Ala. 1982). Proof of spoliation will support an inference of guilt or negligence. May, 424 So.2d at 603. One can prove spoliation by showing that a party purposefully or wrongfully destroyed a document that the party knew supported the interest of the party's opponent. Id.
Wal-Mart insists that because Goodman's counsel made a copy of the front of the box it is obvious that Goodman knew or should have known the importance of the box as a piece of evidence. However, nothing in the record shows that Goodman knew that the entire box would be a key piece of evidence in her case, and Wal-Mart provided no evidence to show that Goodman intentionally destroyed the box in order to inhibit Wal-Mart's case. Wal-Mart is not entitled to a new trial on the basis that Goodman or her counsel did not preserve the original package.
 VI. Ex parte Out-of-Court "Experiment" by the Plaintiff
Wal-Mart also argues that it should be granted a new trial because of an "experiment" it says Goodman conducted during the trial. This so-called experiment occurred when Goodman's counsel went to a local Wal-Mart store to investigate the *Page 177 
technique Wal-Mart used when customers returned merchandise. In that investigation, Goodman's counsel discussed with one of the assistant store managers the technique by which the greeter labels were applied to merchandise customers carried into the store. During this investigation, Goodman's counsel asked that a greeter label be affixed to a piece of merchandise, a box of wine glasses, to illustrate the merchandise-return procedures. Then Goodman's counsel asked the manager to remove the sticker, just as he would if someone were returning the merchandise. The manager did so, and the word "VOID" did not appear on the box. Goodman's counsel subpoenaed the manager to testify, in an effort to rebut earlier testimony by a Wal-Mart corporate representative claiming that if an affixed "greeter label" was removed from the merchandise, an impression of the word "VOID" would always be imprinted on that piece of merchandise.
Alabama State Bar Ethics Opinions RO-84-160, RO-86-125, RO-88-27, and RO-88-34 answer the question whether any ethical prohibition forbids counsel to directly contact and interview witnesses for a defendant corporation without first contacting counsel for the corporation. These opinions stand for this proposition:
 "[Opposing counsel] may directly contact and interview certain employee witnesses of the defendant, without the necessity of obtaining permission from the defendant or giving notice to the defendant's attorney. . . . [But opposing counsel] may not interview, without notice and permission, witnesses who are in a position to bind the defendant. [In addition,] such contact may be initiated without reference to whether suit has been filed or is merely anticipated."
Ethics Opinion, RO-88-34. (Citation omitted.)
The assistant store manager did not act as a corporate agent with the authority to bind Wal-Mart. No evidence indicated that he had the authority to commit Wal-Mart to his statements in any way. Thus, Goodman's counsel was not required to notify Wal-Mart regarding his contact with its employee. Because Goodman's counsel was acting were within the scope of the rules when he interviewed the assistant store manager regarding Wal-Mart's merchandise-return procedures, no objectionable out-of-court "experiment" occurred and the court properly allowed the manager's testimony offered to rebut earlier testimony presented for Wal-Mart.
 VII. Excessiveness of the Damages Award
Wal-Mart claims (1) that the award of mental-anguish damages is not supported by the record and (2) that the punitive-damages award does not withstand scrutiny under the principles of BMW v. Gore or Hammond andGreen Oil. Wal-Mart asks this Court to vacate, or alternatively, to order a substantial remittitur of the damages award.
 A. Compensatory Damages
First, Wal-Mart argues that Goodman presented no direct evidence indicating that she suffered any mental anguish and no corroborative medical evidence indicating that she sought medical treatment for the mental anguish she claimed to have suffered. In its brief, Wal-Mart claims that Goodman's mental anguish was "scant at best" and that in her testimony she described her mental anguish as simply "hard." Moreover, Wal-Mart maintains that Goodman could not corroborate her claim that she sought medical treatment because of the mental anguish and that in fact her testimony was contradicted by the custodian of records from the medical center she claimed to have visited. Wal-Mart *Page 178 
also points out that the person who was Goodman's roommate at the time of the incident testified that she posted bail for Goodman and that Goodman was happy and grinning when she was released from jail.
A physical injury or physical symptom is not a prerequisite for a finding of mental anguish. Kmart Corp. v. Kyles, 723 So.2d 572, 578
(Ala. 1998). A plaintiff is required only to present some evidence of mental anguish, and once the plaintiff has done so the question whether the plaintiff has suffered mental anguish and, if so, the question of how much compensation the plaintiff is entitled to for the mental anguish are questions for the jury. Kyles, 723 So.2d at 578. The amount of the jury's award is left to the jury's sound discretion, and it will not be set aside absent a clear abuse of discretion. Id. A jury's verdict is presumed correct, and that presumption is strengthened by the trial court's denial of a motion for a new trial. Id.
In Foster v. Life Insurance Co. of Georgia, 656 So.2d 333, 337 (Ala. 1994), this Court stated:
 "We recognize that mental anguish and emotional distress are not items for which a precise amount of damages can be assessed; thus, in considering whether a jury verdict for compensatory damages is excessive, we must view the evidence from the plaintiff's perspective and determine what the evidence supports in terms of the plaintiff's suffering."
This Court then ordered a reduction of the mental-anguish compensatory damages in Foster from $250,000 to $50,000, noting that the plaintiff's suffering during the two months between the injury and the filing of the plaintiff's action could not justify an award exceeding $120,000 for each month.
Wal-Mart cites Kyles in order to support its proposition that the compensatory-damages award should be reduced. In Kyles, the jury awarded the plaintiff $100,000 in compensatory damages and $100,000 in punitive damages in her malicious-prosecution case against Kmart Corporation. Kmart suspected Kyles of shoplifting lawn chairs from the front of the store, and it subsequently had a warrant sworn out for her arrest. The grand jury no-billed the charge. Kyles sued Kmart and its loss-prevention employee. At trial, however, Kyles presented no testimony or other evidence indicating that the circumstances surrounding her arrest had caused her to suffer mental anguish, other than her husband's testimony that she cried when she telephoned to ask him to pick her up at the jail. This Court ordered a remittitur of her compensatory damages to $15,000, reasoning that this was the greatest amount of compensatory damages that a jury, using sound discretion, could have awarded her.
Wal-Mart also cites Delchamps, Inc. v. Bryant, supra, 738 So.2d 824, a case in which this Court ordered a reduction of the jury's award of compensatory damages for mental anguish, from $400,000 to $100,000. Bryant was arrested for shoplifting two cartons of cigarettes from a Delchamps grocery store. An employee at the Delchamps store suspected the theft and told the assistant store manager. The manager questioned the suspect in the front of the store, but allowed him to leave. The manager wrote down the license-plate number of the automobile the suspect entered and then telephoned the Jefferson County Sheriff's Department. The investigation by the sheriff's department led to the arrest of Bryant. The criminal case against him, however, was nol-prossed because he presented evidence indicating that at the time of the alleged theft he was incarcerated. Bryant sued Delchamps, *Page 179 
Inc., alleging malicious prosecution and claiming compensatory damages for mental anguish. At trial, Bryant testified, describing his arrest and incarceration; his hiring an attorney; the lapse of time between the arrest and the nol-prossing of his case; and his concern that a conviction could lead to his return to prison for a minimum of 10 years. This Court held that the scant direct testimony about mental anguish and the absence of any corroborating description of the intensity of his suffering could not have led a reasonable jury to award $400,000 in compensatory damages. We concluded that the greatest amount of compensatory damages a jury could have awarded based on the evidence was $100,000.[7]
Goodman testified at trial concerning the stress she claimed to have undergone because of worry over the case. She also testified that the arrest caused her to suffer lower abdominal pains during her pregnancy, pains she said lasted for several days and caused her to be very anxious over the health of her unborn child. She discussed the embarrassment and humiliation she said she felt because of the arrest on Christmas Eve, a very busy shopping day, and being led out of the Wal-Mart store in handcuffs, escorted by the police officers and accompanied by her two young children. She stated that she remains embarrassed over what has happened. Goodman also stated that at the time of the arrest, she was worried about whether her children were going to be taken away from her because she says she could not immediately find anyone to pick them up from the police station. Moreover, she testified that she was fired from her job as a consequence of the arrest and that she had a difficult time finding other employment. She was given a trial date in February 1996 (for trial of the shoplifting case); because she failed to appear for that trial, she was arrested and placed in a holding cell on March 25, 1996, to await trial. At trial, she was found not guilty.
Goodman's evidence of mental anguish afforded Wal-Mart ample opportunity for cross-examination.[8] The jury, after hearing Goodman's testimony and after hearing Wal-Mart's evidence tending to minimize Goodman's injury or harm,[9] awarded her $200,000 in compensatory damages for mental anguish. The jury's award does not shock the conscience of this Court. We cannot say Goodman's mental anguish was limited to the period between her arrest and her acquittal, because her testimony suggested she suffered it for a longer time than that. CompareSouthern Energy Homes, Inc. v. Washington, 774 So.2d 505 (Ala. 2000) (upholding damages award to plaintiff who testified that his mental anguish consisted of anger, embarrassment, and disruption of his sleep over a period of nearly five years); Bryant, *Page 180 738 So.2d at 839 (reducing the compensatory-damages award for mental anguish lasting for only four months).
Given the evidence concerning Goodman's mental anguish, and viewing it from the plaintiff's perspective, we cannot say the amount awarded was beyond what a properly functioning jury, using sound discretion, could award. While the damages award is high and borders upon excessiveness, we have no basis to interfere with the judgment of the jury. We therefore affirm the compensatory-damages award.
 B. Punitive Damages
Wal-Mart argues that the jury's award of $3 million for punitive damages is not supported by clear and convincing evidence, is grossly excessive, and does not withstand the constitutional scrutiny established by the United States Supreme Court in BMW of North America, Inc. v.Gore, 517 U.S. 559 (1996) (hereinafter "BMW"), or the factors this Court set out in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), andGreen Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989) (hereinafter "Hammond/Green Oil"). The trial court ordered a remittitur of the punitive-damages award to $1 million after considering a postjudgment motion made by Wal-Mart. On Goodman's motion, however, the court reinstated the $3-million punitive-damages award. Wal-Mart asks us to vacate, or order a substantial remittitur of, the punitive-damages award, based upon the BMW guideposts and the Hammond/Green Oil factors.
 1. The BMW "Guideposts"
We first analyze the punitive-damages award pursuant to the three "guideposts" established by the United States Supreme Court in BMW. This Court analyzes these factors with the presumption that the jury reached a correct verdict based on the issues presented.
 a. The reprehensibility of Wal-Mart's conduct
"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW, 517 U.S. at 575. The verdict entered by the jury in the present case is based upon a finding of malice and a lack of probable cause with respect to the arrest made by Wal-Mart. A jury's finding of malicious conduct indicates a very high degree of reprehensible conduct. See TXO Prod. Corp. v. Alliance Resources Corp.,509 U.S. 443 (1994) (upholding the high ratio of a punitive award of $10 million to a compensatory award of $19,000, based upon a finding of malicious conduct by the defendant). In a malicious-prosecution case, the jury may, from evidence indicating a lack of probable cause, infer malice on the part of the defendant. Bryant, 738 So.2d at 833. However, this inference of malice may be rebutted by evidence indicating the defendant acted in good faith. Id.
The evidence presented by Wal-Mart demonstrates that after she detained Goodman, Milner failed to act in good faith by exercising ordinary caution and prudence that would support a finding of an honest or strong suspicion. She failed to verify whether the receipt was legitimate or to investigate Goodman's contentions. The jury apparently determined that this failure indicated a lack of probable cause and indicated malice. On the other hand, Milner and Goodman did not know each other and had never met. They are of the same ethnicity, and no evidence presented at trial suggests that Milner had any vindictive, spiteful, or other improper motives. If the evidence stopped here, we would be inclined to compare this case to *Page 181 Bryant, where no punitive damages were awarded under similar circumstances — a failure to pursue information that would have exonerated the plaintiff. However, this case presents several additional factors. Upon Goodman's acquittal, Wal-Mart again demanded that she return the telephone. Wal-Mart's failure to address the significance of the receipt continues in the proceeding before this Court; it fails to address in its brief here the significance of the receipt. The evidence regarding Wal-Mart's loss-prevention policy, viewed favorably to Goodman, suggested the policy gave an unhealthy incentive for employees to make arrests in order to obtain favorable performance ratings.[10] Even after Goodman was acquitted, Wal-Mart demanded the return of the telephone. Wal-Mart's evidence regarding its merchandise-return practices was impeached by testimony of a Wal-Mart employee.
The trial court's order finds the conduct and the degree of reprehensibility sufficient to warrant a 15:1 ratio of punitive damages to compensatory damages. If we attached a presumption of correctness to the trial court's view of the propriety of the ratio, we would abdicate our responsibilities under BMW and Hammond. We must evaluate the evidence and make an independent determination of what would be a proper ratio. We have applied a ratio of three to one in instances of reprehensibility that caused substantial compensable damage without causing physical injury and that involved no outrageous or contemptible conduct. See Prudential Ballard Realty Co. v. Weatherly, [Ms. 1981671, July 28, 2000] ___ So.2d ___ (Ala. 2000) (reducing a punitive-damages award to a 3:1 ratio, based on conduct that was reprehensible but that involved no physical injury); American Pioneer Life Ins. Co. v.Williamson, 704 So.2d 1361 (Ala. 1997) (reducing the punitive-damages award to $750,000, for a 3:1 punitive-to-compensatory ratio; the jury had awarded $250,000 in compensatory damages in a breach-of-contract action where the plaintiff had suffered no harm to health and no risk to safety but the defendant's actions were found reprehensible). The Legislature has recently enacted a 3:1 punitive-damages cap for cases such as this present case. See § 6-11-21, Ala. Code 1975. We find the 3:1 ratio appropriate in this case, in view of Wal-Mart's conduct at the time of the arrest and its conduct thereafter, as well as the evidence concerning Wal-Mart's loss-prevention policies.
 b. The ratio of punitive damages to actual harm
A second indicium of either reasonableness or excessiveness of the jury's punitive-damages award is the ratio between the amount of punitive damages awarded and the actual harm to the plaintiff. BMW,517 U.S. at 580. As we stated in Employees' Benefit Ass'n v. Grissett, 732 So.2d 968,979 (Ala. 1998):
 "The guaranty of due process does not require that this Court apply a mathematical formula to determine whether a punitive damages award is excessive; therefore, a remittitur generally is not justified solely on the basis of a high ratio. The ratio between the [punitive damages and the compensatory] damages awards must be reasonable; however, *Page 182 
a higher ratio may be justified in cases in which the harm to the plaintiff is hard to detect or the monetary value of noneconomic harm is difficult to determine. This Court has found constitutionally acceptable ratios ranging from [1:1 to 121:1]."
(Citations omitted.)
The ratio of the jury's $3-million punitive-damages award to its $200,000 compensatory-damages award is 15:1. Given the circumstances of this case, we find that ratio unacceptably high.
 c. Sanctions for comparable misconduct
We have no basis for considering this factor relevant.
 d. Summary of the BMW analysis
Our analysis of the BMW guideposts indicates that the punitive-damages award was excessive, because of the low level of reprehensibility and the high ratio between the punitive-and compensatory-damages awards.
 2. The Hammond/Green Oil Factors
Next, we analyze the punitive-damages award pursuant to theHammond/Green Oil factors, which were established by this Court. Again, we analyze these factors with the presumption that the jury reached a correct verdict based on the issues presented.
 a. The punitive-damages award and the actual or likely harm
"Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater." Green Oil Co. v. Hornsby, 539 So.2d 218, 223
(Ala. 1989), quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062
(Ala. 1987) (Houston, J., concurring specially).
We have determined that the award of $200,000 for compensatory damages, while borderline, was not excessive. These damages were awarded for the mental anguish, or actual harm, Goodman suffered. Wal-Mart's conduct was not grievous. While the evidence supports an award of more than the minimal amount of punitive damages, we conclude that the $3-million award does not bear a reasonable relationship to the actual harm Goodman suffered or was likely to suffer.
 b. The reprehensibility of Wal-Mart's conduct
The review of the reprehensibility of Wal-Mart's conduct is broader in a Hammond/Green Oil review than in a BMW review. We must consider "the duration of [the] conduct, the degree of the defendant's awareness of any hazard which [its] conduct has caused or is likely to cause, and any concealment or `cover-up' of that hazard, and the existence and frequency of similar past conduct." Green Oil, 539 So.2d at 223. First, this case does not involve a continuing pattern or practice of conduct by Wal-Mart against Goodman. Although Goodman argues that Wal-Mart's policy of evaluating the job performance of its loss-prevention employees was based upon the number of apprehensions that were made, we do not infer that Wal-Mart, in an effort to obtain more apprehensions and arrests, was completely oblivious to the existence, or lack thereof, of probable cause. Next, Wal-Mart was concerned with the likelihood of hazards in effectuating an arrest without probable cause. The company emphasized to its employees that they must be absolutely certain that suspected persons had actually shoplifted merchandise from the store.
Overall, the circumstances surrounding the conduct of Wal-Mart at the time of Goodman's arrest, especially the fact that *Page 183 
Goodman claimed to have a receipt for the telephone, a claim that warranted further investigation, weigh in favor of an award of punitive damages. However, these circumstances do not warrant a punitive-damages verdict of anything near $3 million, 15 times the compensatory damages of $200,000.
 c. Wal-Mart's profit from its misconduct
If the defendant's wrongful conduct was profitable, then we consider whether the punitive-damages award removes the profit and whether it exceeds the profit so that the defendant recognizes a loss. Green Oil,539 So.2d at 223. No evidence indicates that Wal-Mart realized any profit from the arrest of Goodman. To the extent Wal-Mart may have profited, it is clear that the $3-million punitive-damages award would not only remove any profit, but would far exceed any profit. This factor weighs in favor of finding that the punitive-damages award was excessive.
 d. Wal-Mart's financial position
Wal-Mart is a large corporation with tremendous financial power; it has a large market value and a large net income. The verdict of $3 million would not have a devastating impact upon Wal-Mart. This factor weighs against a finding of excessiveness.
 e. Costs of litigation
We must consider whether the punitive-damages award sufficiently rewarded the plaintiff's counsel for assuming the risk of bringing the lawsuit and encouraged other plaintiffs to bring wrongdoers to trial.Green Oil, 539 So.2d at 223. Goodman argues that the litigation costs were substantial; however, substantial litigation costs, alone, will not justify a substantial award. Goodman claims in her brief that the litigation costs she incurred included costs incurred in regard to repeated discovery hearings, which required extensive travel; multiple depositions, which also required extensive travel; numerous discovery motions; and a three-day trial involving numerous exhibits, witnesses, and demonstrative aids. This factor weighs against finding the punitive-damages award excessive.
 f. Criminal sanctions
No criminal sanctions have been imposed upon Wal-Mart for its conduct; therefore, this factor is inapplicable.
 g. Other civil actions
No testimony or documentary evidence presented at trial indicated that other civil actions are pending against Wal-Mart based upon the same corporate conduct. This factor weighs against a finding of excessiveness.
 h. Summary of the Hammond/Green Oil analysis
After considering each of the Hammond/Green Oil factors, we conclude that one of the factors is inapplicable to the issue of excessiveness. Three of the factors weigh in favor of a finding of excessiveness: the degree of reprehensibility of Wal-Mart's conduct, the degree to which Wal-Mart profited, and the actual or likely harm involved. The same number of factors weigh against a finding of excessiveness: the costs of litigation to Goodman, other civil actions pending, and Wal-Mart's financial position.
 3. Final Analysis of the Punitive-Damages Award
The final consideration of the question of excessiveness of the punitive-damages award of $3 million, made in light of the factors enumerated above, leads us to conclude that a punitive-damages award of $600,000 would be sufficient to punish *Page 184 
Wal-Mart and deter it from further conduct similar to that evidenced in this case, without compromising its due-process rights. A punitive-damages award of $600,000 would reduce the ratio of punitive damages to compensatory damages from 15:1 to 3:1; we consider 3:1 an appropriate ratio, considering the degree of reprehensibility of Wal-Mart's conduct.
 VIII. Change of Venue upon Retrial
Wal-Mart argues that it would be in the interest of justice to transfer this case to Lee County, based on the statutory doctrine of forum nonconveniens, if this Court orders a new trial. Wal-Mart also argues that the case should be transferred to accommodate the convenience of the parties, pointing out (1) that Goodman no longer lives in Macon County, (2) that the incident forming the basis of the action occurred in Lee County, and (3) that substantially all of the witnesses are located in Lee County. Given these factors, Wal-Mart argues that Lee County would be a more convenient forum in which to conduct the new trial.
Wal-Mart relies on Cunningham v. Langston, Frazer, Sweet Freese,P.A., 727 So.2d 800 (Ala. 1999), in which this Court set out the standard a trial judge should use when considering a request for a change of venue based on a defendant's claim that another county would be a more convenient forum:
 "`The doctrine of forum non conveniens was formally adopted in this state and codified at § 6-3-21.1, Ala. Code 1975; the doctrine has a field of operation only where an action is commenced in a county in which venue is appropriate. Transfers under this Code section are within the discretion of the trial judge. The purpose of the doctrine is to prevent the waste of time, energy, and money and also to protect witnesses, litigants, and the public against unnecessary expense and inconvenience. . . . Section 6-3-21.1(a) reads as follows:
 "`"(a) With respect to civil actions filed in an appropriate venue, any court of general jurisdiction shall, for the convenience of parties and witnesses, or in the interest of justice, transfer any civil action or any claim in any civil action to any court of general jurisdiction in which the action might have been properly filed and the case shall proceed as though originally filed therein."
 "`The burden of proof under this doctrine is on the defendant to prove to the satisfaction of the trial court that the defendant's inconvenience and expense of defending the action in the venue selected by the plaintiff are such that the plaintiff's right to choose the forum is overcome. Stated differently, the transferee forum must be significantly more convenient than the forum in which the action is filed by the plaintiff, to justify transfer. . . .'"
Cunningham, 727 So.2d at 806-07 (quoting Ex parte Townsend, 589 So.2d 711,714 (Ala. 1991).
In Cunningham, this Court upheld the trial court's transfer of a case from Jefferson County even though the plaintiff had filed his action in the Jefferson Circuit Court and that court had jurisdiction over the action. We found it appropriate for the trial court to transfer the action to the Sumter Circuit Court because that court had tried the case that had produced the fee award that was at dispute in the Jefferson County action; the judge of the Sumter Circuit Court was familiar with the underlying issues in the case and with the attorneys involved; and that judge had expressly retained jurisdiction over any matters arising from the underlying case. These factors led the judge of the Jefferson Circuit Court to conclude that *Page 185 
Sumter County was a significantly more convenient forum and that the interests of justice or the convenience of parties and witnesses would be best served by transferring the case.
Because we are not ordering a new trial in this case, we do not address the merits of Wal-Mart's claim that Lee County is a more convenient venue. If Goodman chooses a new trial over a remittitur of damages, then Wal-Mart may move for a change of venue based on the doctrine of forumnon conveniens. It would be premature for this Court to determine now whether a change of venue would be appropriate if the plaintiff chooses a new trial.
 IX. Conclusion
The judgment is affirmed on the condition that Goodman file with this Court within 21 days a remittitur of punitive damages to the sum of $600,000; otherwise, the judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.*
Maddox, Houston, Cook, Brown, and England, JJ., concur.
Johnstone, J., concurs in part and concurs in the result in part.
Hooper, C.J., dissents.
* Note from the reporter of decisions: On January 30, 2001, the Supreme Court entered the following order in this case:
 "IT IS ORDERED . . . that the joint motion to dismiss the appeal is granted, and the appeal is dismissed.
 "IT IS FURTHER ORDERED that costs be taxed as provided in the settlement agreement."
[1] Some documents in the record refer to the plaintiff as LaShawna
Chenice Goodman or LaShawna Chenice Goodman.
[2] Batson v. Kentucky, 476 U.S. 79 (1986).
[3] BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996).
[4] Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986).
[5] Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989).
[6] The Chief Justice, in his dissent, considers the evidence in a light most favorable to the defendants — against whom the jury returned a verdict. However, we are obliged to consider the evidence in a light most favorable to the plaintiff — for whom the jury returned its verdict. Motion Indus., Inc., 678 So.2d at 726.
[7] The facts of Bryant, on the issue of liability, are similar to the facts of this present case to the extent that the defendant failed to pursue evidence that would have exonerated the plaintiff. However, inBryant, the jury did not assess punitive damages.
[8] This is not a case where the plaintiff presented only a minimum of evidence regarding mental anguish, so as possibly to avoid being cross-examined by questions calling for information about the plaintiff's prior experiences. Compare Bryant, 738 So.2d at 835 (testimony from the plaintiff could have led to cross-examination about previous felony convictions); Kyles, 723 So.2d at 579 (testimony from the plaintiff concerning mental anguish could have led to cross-examination about previous arrests).
[9] Wal-Mart attempted to impeach Goodman's testimony concerning medical treatment by pointing out that she had presented no medical records to support her claim that she had received treatment.
[10] Wal-Mart has a four-element stop policy. It requires that an apprehension must (a) concern Wal-Mart's property, (b) result from maintained eye contact with the person apprehended, (c) result from observed concealment, and (d) occur after the suspected person has exited the store. The policy does not deal with the question of whether a Wal-Mart employee apprehending someone is to explore any information given in explanation of the alleged wrongdoing.