62 So.3d 474 (2010)
Julia Huff WALKER
v.
CITY OF HUNTSVILLE et al.
1090431.
Supreme Court of Alabama.
September 30, 2010.
Rehearing Denied November 24, 2010.
*478 Linda L. Cole, Birmingham, for appellant.
Michael L. Fees, C. Gregory Burgess, and Nori D. Horton of Fees & Burgess, P.C., Huntsville, for appellees.
LYONS, Justice.
Julia Huff Walker appeals from a summary judgment entered by the Madison Circuit Court in favor of the City of Huntsville ("the City"); former Huntsville Chief of Police, Compton Owens ("Chief Owens); Huntsville police officer Rhonda Rosser; and Huntsville police officer Jennifer Watkins. We affirm.

Procedural History
Officer Watkins arrested Walker on July 28, 2002, for driving under the influence and for unlawfully stopping her vehicle in an intersection. Walker was detained in the City's jail for approximately 24 hours, and the City subsequently prosecuted her on both charges. Walker, however, was not under the influence of an intoxicating substance at the time of her arrest; she was suffering from a brain aneurysm. On January 23, 2003, in compliance with § 11-47-192, Ala.Code 1975, Walker notified the City of her potential claims. The charges against Walker were dismissed on January 28, 2003. On July 28, 2004, Walker sued the City, Chief Owens, and Officers Rosser and Watkins (hereinafter referred to collectively as "the defendants") in the Madison Circuit Court. Walker stated claims related to her arrest and detention under 42 U.S.C. § 1983, alleging violations to the Fourth and Fourteenth Amendments to the United States Constitution. Walker also stated state-law claims of negligence, malicious prosecution, false imprisonment, false arrest, the tort of outrage, assault and battery, and invasion of privacy.
The action was removed to the United States District Court for the Northern District of Alabama ("the federal court"). While the action was pending before the federal court, Walker amended her complaint, and the defendants moved for a summary judgment. On June 11, 2008, the federal court granted the defendants' motion for a summary judgment as to Walker's § 1983 claims. The federal court then declined to exercise supplemental jurisdiction over Walker's state-law claims under 28 U.S.C. § 1367 and remanded the action to the Madison Circuit Court. Walker appealed from the summary judgment and on February 6, 2009, the United States Court of Appeals for the Eleventh Circuit affirmed.
On remand, the defendants moved for a summary judgment as to Walker's state-law claims. They argued that Walker's claims were barred under the doctrine of collateral estoppel; that the individual defendants were entitled to have the charges against the dismissed on the basis of State-agent immunity; that the City was entitled to municipal immunity; and that Walker had not presented substantial evidence to support her claims. Walker responded, *479 arguing, in part, that the defendants were guilty of spoliation of evidence.
Five days before the hearing on the defendants' motions, the City filed a second summary-judgment motion raising additional arguments regarding Walker's assertions that the City was liable for the actions of certain nonparty jail personnel. At the hearing, Walker objected to the City's second summary-judgment motion on the basis that it was untimely. The trial court twice asked Walker's counsel whether Walker wanted more time to respond to the City's second motion. On both occasions, Walker's counsel restated objections to the City's motion and then moved on to substantive arguments. Walker's counsel did not ask for more time to respond to the City's motion.
On September 11, 2009, the trial court entered an order granting the defendants' motions for a summary judgment as to all of Walker's claims. The trial court did not state the reasons for its decision. In a footnote to its order, the trial court stated: "As discussed during oral arguments, [Walker] had adequate time to address the issues in the [City's] second motion for summary judgment and had amply addressed those same issues in her opposition brief filed [previously]." Walker moved to alter, amend, or vacate the trial court's judgment. The trial court denied that motion; Walker appealed.

Factual Background
In July 2002, Walker, who was then 48 years old, lived in Marshall County with one of her two adult sons and his wife. During the weekend of July 26, 2002, Walker visited a friend in Huntsville. Walker testified at her deposition that she remembers getting sick to her stomach at her friend's house on the evening of Saturday, July 27, 2002. Walker has no memory of anything that occurred from that time until early September 2002, approximately six weeks later. Accordingly, the facts underlying Walker's claims are largely undisputed and are evidenced primarily by the City's records and by the testimony of the officers involved in Walker's arrest and detention.

I. Walker's Arrest

On Sunday, July 28, 2002, at approximately 4:00 p.m., the Huntsville Police Department ("the Department") received a telephone call from an individual who complained that a female driver had "just mowed down several mailboxes" in a residential area. Officers Watkins and Rosser were dispatched to the scene. Watkins arrived first and found Walker's car stopped in an intersection. Approaching the vehicle, Watkins saw Walker slumped over the steering wheel; the engine was running. Watkins opened the passenger door and put the transmission in park. She then opened the driver's door, lifted Walker's head and asked if she was okay. According to Watkins, Walker's response was unintelligible. Watkins then asked Walker to get out of the vehicle. At that time, Walker became what Watkins described during her deposition as "combative." Watkins explained that Walker was in a dazed state, that she started swinging her arms, and that she refused to get out of her vehicle.
Watkins testified that Walker's eyes were bloodshot, that her hair was in disarray, that her speech was slurred, and that she appeared very confused. In Watkins's arrest report, she described Walker as "half asleep and half awake." Watkins did not smell alcohol on Walker's breath or person, and she did not ask Walker if she had been drinking or taking drugs. Watkins testified that Walker demonstrated "all the same characteristics of previous [driving-under-the-influence] arrests" Watkins had made.
*480 Watkins removed Walker from the vehicle and placed her on the ground using what Watkins described as a "slight leg sweep." Watkins stated that she placed Walker on the ground to control her because Walker was combative and flailing her arms. Watkins handcuffed Walker and placed her under arrest for driving under the influence of alcohol or a controlled substance ("DUI") in violation of § 32-5A-191(a)(5), Ala.Code 1975,[1] and for stopping, standing, or parking in a roadway or intersection in violation of § 32-5A-137(a), Ala.Code 1975.[2] The dispatcher's log shows that just over two minutes passed between Watkins's arrival on the scene and Walker's arrest.
After the arrest, Watkins searched Walker's purse and found Walker's identification and several pills that Watkins could not identify. Watkins confiscated the pills and later turned them over to the Department's evidence division. Watkins did not test Walker's breath-alcohol content or perform any other sobriety tests on Walker. She testified, however, that such tests would not be administered if the individual was uncooperative.
Chief Owens, the chief of police at the time of Walker's arrest, was responsible for developing and implementing the Department's policies, primarily in the form of written directives. Chief Owens was also ultimately responsible for hiring and training the Department's employees. He testified that Huntsville police officers received 40 hours of initial training regarding DUI enforcement and arrests, including training regarding behaviors to look for and standard field-sobriety tests. Chief Owens testified that, in making DUI arrests, Huntsville police officers usually base the decision to arrest on the actions of the individual and on the officer's observations of the individual's appearance and demeanor. Specifically, Chief Owens stated that Huntsville police officers considered whether the individual had slurred speech patterns, bloodshot eyes, an odor of alcohol on the breath, and/or was incoherent. Chief Owens also stated that the officers had to determine whether it was safe enough to perform a field-sobriety test. The only written directive made a part of the record on appeal relating to DUI arrests is a directive regarding drug evidence, which relates primarily to the collection and handling of bodily fluids. It does not require that such evidence be collected, and none was ever collected from Walker.
Before Watkins transferred Walker from the scene to the City's jail, Officer Rosser arrived. Rosser testified at her deposition that she arrived at the scene as Watkins was helping Walker up off the ground. Watkins testified that Rosser arrived as she was placing Walker, who was resisting, in the police vehicle. Nonetheless, it is undisputed that Rosser spoke briefly with Watkins and then proceeded to impound Walker's vehicle and to speak with the witnesses present at the scene. Rosser stated that, as she and Watkins were talking, Walker said that she needed to get dressed and asked what Rosser and *481 Watkins were doing in her living room. Rosser described Walker as looking "wild" and stated that Walker did not understand what was going on. In her incident report, Rosser stated: "The female appeared to be under the influence of narcotics. The female kept ranting about needing to get dressed. She had no idea where she was or who we were."
Ronald Sheaffer, a resident of the neighborhood where Walker was arrested, stated in an affidavit that he saw Walker drive slowly through his neighbor's yard, back up and move forward several times, drive on the wrong side of the street, hit a mailbox without stopping, continue off the street onto a sidewalk, and finally stop in the intersection where she was arrested. Sheaffer witnessed Walker's arrest. He stated that when Watkins "assisted" Walker out of her vehicle, he noticed that Walker had bruises on both of her arms and on her eyes. Rosser and Watkins testified that they did not recall noticing that Walker was bruised. Sheaffer stated: "It was obvious to me from my observation of Ms. Walker's appearance and demeanor after she exited her car, coupled with my observation of her driving, that Ms. Walker was drunk."
Another witness, Kathy Sue Werndli, whose mailbox Walker had driven into, also saw Walker's arrest. She stated in an affidavit that she saw Walker become physically aggressive with Watkins and that Watkins "perform[ed] a gentle maneuver which resulted in Ms. Walker going to the ground." Werndli stated: "it was obvious to me by [Walker's] behavior and appearance that she was either drunk or under the influence of drugs." Werndli also stated that she did not observe Watkins or Rosser mistreat Walker in any way. Werndli's account differed slightly from Watkins's and Sheaffer's in that she stated that she saw Walker get out of her vehicle on her own.
Both Watkins and Rosser testified that they believed that Watkins was under the influence of alcohol or drugs because she displayed symptoms characteristic of persons under the influence. Watkins testified that she did not believe that Walker needed medical attention and that she would have called paramedics to the scene if she had known Walker needed medical treatment. Both Watkins and Rosser testified that they had received training in first aid and CPR. Watkins testified that she did not receive any training on how to distinguish between intoxication and a medical condition presenting similar symptoms.
Watkins transported Walker to the City's jail shortly after her arrest while Rosser impounded Walker's vehicle and completed an incident report. The Department's written directive regarding arrest procedures does not state under what circumstances a prisoner should be transported to the hospital instead of to the jail. The Department's written directive regarding the transportation of prisoners states: "Any prisoner who is injured prior to or during an arrest will not be transported to the City detention facility until he/she has been transported to and offered treatment at an approved medical facility." That directive defines an injury as "any broken bone, cut in the skin requiring stitches, or any other injury or condition a supervisor or detention facility officer determines must be treated." It does not state any specific procedures regarding prisoners who are under the influence of alcohol or drugs or regarding prisoners who are ill, except those with contagious disease. Chief Owens testified that the arresting officer typically would make the decision whether to transfer a prisoner to the hospital instead of to jail. Chief Owens *482 did not recall any written guideline detailing when an officer should transport a prisoner to the hospital instead of to jail.

II. Walker's Detention

Although Chief Owens was not directly involved in the administration of the jail in July 2002, ultimatelythrough several layers of bureaucracyhe was responsible for the hiring of its officers, for its operations, and for the development and enforcement of its policies. Chief Owens testified that, in July 2002, the City had a jail nurse who was on duty Monday through Friday during "regular business hours" and who was on call at nights and during the weekends. The jail nurse on duty at the time of Walker's detention has not been positively identified. During discovery, three nurses were identified as potentially being the nurse on duty. However, one never worked as a jail nurse, another was never deposed, and the third did not recall Walker and could not confirm whether she was on duty during Walker's detention. It is unclear whether the jail nurse was employed by the City or by a local hospital that had a contract with the City to provide nursing services for the jail. Walker requested that the City and the hospital produce the contract if it existed; however, neither entity could locate a contract.
At the time of their depositions, none of the detention officers on duty during Walker's detention remembered her. As a result, and because of Walker's amnesia and the lack of information regarding the jail nurse, all the facts known about Walker's detention come from the jail records. Notably, on February 1, 2003, just a few days after Walker notified the City of her claims, administration of the jail was transferred from the City to Madison County pursuant to an intergovernmental agreement. Chief Owens testified that the transfer occurred because of cost-management issues and that, after the transfer, the jail was administered by the county and housed both city and county prisoners. A detention officer who was employed at the jail during the transfer testified at her deposition that "there was so much chaos, I don't know where the paperwork or half of the things went." The jail records presented by the parties to the trial court show the following facts regarding Walker's detention and the jail policies in place at that time.
The City had several written operations policies regarding inmates who were intoxicated or in need of medical care. Policy No. B-106 required booking officers to complete a form, which the jail personnel generally referred to as the "medical questionnaire," "as soon as the inmate [was] cooperative enough to answer questions." The policy stated:
"If during the completion of the form it is determined to deny admission of the inmate until medical clearance is obtained, the Detention Supervisor or Detention Officer in Charge (DOIC) will complete as much of the ... form as possible and complete a Denial of Admission Form. . . .
". . . .
"The following types of new inmates will be denied admission to the facility until evaluated by the jail nurse. If the jail nurse is unavailable, the arresting officer will transport the inmate to the City of Huntsville approved medical provider for proper treatment and clearance.
"Inmates who are unconscious;
"Inmates who are having or who have recently had convulsions;
"Inmates with any significant external bleeding;
"Inmates with any obvious fractures;

*483 "Inmates with signs of head injuries;
"Inmates with neck or spinal injuries;
"Inmates with any type of serious injury;
"Inmates who cannot walk under their own power;
"Inmates who display symptoms of internal bleeding;
"Inmates with abdominal bleeding;
"Pregnant women in labor;
"Pregnant women with any other serious problem(s);
"Extremely intoxicated or incapacitated behavior;
"Breathing difficulties;
"Seizures;
"Apparent hallucinations; and/or
"Other serious indications.
"The jail nurse will maintain all inmate medical screening records."
Separately, Policy No. B-108 stated the jail policies and procedures related to intoxicated inmates. That policy stated:
"Inmates who appear to be under the influence of alcohol or other drugs will be housed in Close Observation Cells until the Detention Supervisor or Detention Officer in Charge (DOIC) determines that frequent observation is no longer necessary.
"Inmates who demonstrate potentially serious medical conditions to include but not limited to the following will be denied admission until evaluated by the jail nurse or City of Huntsville approved medical services provider:
"Unconsciousness;
"Extremely intoxicated or incapacitated behavior;
"Breathing difficulties;
"Convulsions; Seizures;
"Apparent hallucinations; and/or Other serious indications.
"Staff will observe inmates housed in Close Observation Cells at least every fifteen (15) minutes, and staff will document each observation.
"Inmates will be transferred to the appropriate housing unit when a Detention Supervisor determines that the inmate is no longer a threat to themselves, other inmates, staff or the security of the facility."
Policy No. B-108 does not define the term "[e]xtremely intoxicated or incapacitated behavior," and the detention officers did not receive any specific training on how to identify it. Chief Owens testified that, in his opinion, Policy No. B-108 was not discretionary, except that the determination whether an inmate was extremely intoxicated or incapacitated required "a judgment call ... requires a human being to exercise their subjective judgment."
Chief Owens testified that detention officers at the jail were trained and certified annually in basic life support and CPR. Policy No. F-109 required jail personnel to provide medical care to any inmate with an "emergency medical need" and stated procedures for providing that care once it was determined that an inmate required it. The policy, however, did not state any guidelines for determining when an inmate had an "emergency medical need." The deposed detention officers stated that they did not receive any specific training on how to recognize serious medical conditions such as a stroke or head injuries when there was no broken skin.
The jail records show that Walker was booked upon her arrival at the jail and that a booking report was created at approximately 6:00 p.m. Walker was not admitted into the "housing" area of the jail where multiple inmates were held in a single, large cell. Instead, Walker was *484 assigned a cell in the booking area. Several detention officers stated in their depositions that intoxicated inmates were kept in individual holding cells in the booking area where they could be observed until they were sober enough to be held safely in the housing area. A handwritten log entry in a book used by the detention officers to pass information from one shift to the next stated: "1805 [6:05 p.m.]Julia Walker intoxicated at time of booking unable to get prints and do medical."
A medical questionnaire was created for Walker on July 29, 2002, at 1:16 a.m. Several parts of the questionnaire are left blank, including the name of the booking officer, the name of the reviewing nurse, and the line for Walker's signature. There is some testimony to the effect that Walker would have signed an original copy of the questionnaire; however, other testimony indicates that the record was kept by computer only and that a hard copy of the questionnaire with Walker's signature might never have been created. That part of the questionnaire answered by the detention officer states that Walker was conscious, that she did not have any "obvious pain or bleeding or other symptoms suggesting need for emergency service," and that she did not have any "visible signs of trauma or illness requiring immediate emergency or doctor's care." Interestingly, the questionnaire also states that Walker did not appear to be under the influence of alcohol or drugs. That part of the questionnaire answered by Walker states that she had not recently fainted or had a head injury and that she did not have any other medical problems the detention officers should know about.
An entry in the surveillance log states: "8:00 Nurse checked Pentecost, Walker, Wynne and Vinny. Pentecost and Vinny good to go to housing. Wynne and Walker will need to be housed in booking till later date." As stated above, the identity of the nurse who checked Walker remains unknown. The nurse who could not recall whether she was on duty during Walker's detention stated that she completed written forms when she saw an inmate and that those forms were kept in a filing cabinet in an exam room at the jail. She also testified: "Not every contact with a patient or inmate requires written documentation." She explained that, if the inmate was not having physical troubles or she did not observe anything remarkable or abnormal, then there was nothing to say and no need to document the contact.
The surveillance log next stated that at 8:05 a.m. Walker and two other inmates were sent to video arraignment. A computerized entry in Walker's inmate log shows that she was moved from her cell to the municipal court at 8:55 a.m. Although it is unclear precisely when, Walker signed an affidavit-of-indigency form requesting appointed counsel in which she identified her employer, stated her weekly income, her monthly expenses, her marital status, and the fact that she had two adult children. The municipal court denied her request for indigency status. Municipal court records show that, at her arraignment, Walker pleaded not guilty, and her case was set for trial on September 10, 2002. Walker's inmate log shows that she was returned from municipal court to her cell at approximately 1:03 p.m. The surveillance log, however, does not specifically state when Walker returned, but states: "11:30 Court overseveral inmates brought down."
All other entries in the surveillance logs created during Walker's detention say "all ok," "all quiet and secure," or state information regarding other inmates. No other log entries mention Walker by name. Entries in the surveillance logs were made *485 every 30 minutes, not every 15 as required by the jail-operations policy.
Rosser testified that she saw Walker at the jail the day after Walker's arrest, although she did not recall what time. Rosser stated that she saw Walker walking around the booking area outside her cell and that Walker was talking to herself, looking in other rooms and cells, and "bouncing off the walls." Rosser saw Walker for less than five minutes, did not talk to her, and was not close enough to tell if she still appeared to be under the influence of narcotics.
Walker did not make any telephone calls while she was at the jail. Several detention officers testified that telephones were located in the jail's housing area to which Walker was never admitted. However, there is no evidence indicating that Walker requested and was denied access to a telephone. Walker was released to the custody of her sons on the afternoon of July 29, 2002. Her inmate log shows that she left the jail at 4:15 p.m.

III. Walker's Medical Treatment

Walker's sons testified at their depositions that they grew worried for Walker's safety when she did not return home on the day of her arrest. They started looking for her the next morning and found her that afternoon when Walker's daughter-in-law telephoned the Department. Walker's sons drove to the jail, where they paid Walker's bail. She was released into their custody approximately 24 hours after her arrest. They testified that the detention officers told them only that Walker had been arrested for driving under the influence and that she was incoherent.
Walker's sons testified that when they saw her, she appeared to be "in very bad shape." She had several bruises and scratches on her arms and legs; she also seemed disoriented and complained of a headache. Walker's sons stated that she told them she could not remember what had happened to her but denied drinking or using drugs. They further stated that they tried to convince her to see a doctor but that she refused. They stated that they assumed that she was intoxicated because the detention officer they spoke with said she had been arrested for driving under the influence.
Walker's sons made sure that Walker was with a family member during the next 24 hours. When her symptoms did not improve, they insisted that she see a doctor. On Tuesday, July 30, 2002, Walker was admitted to the emergency-room at Gadsden Regional Medical Center. The admitting nurse noted Walker's condition as "non-urgent." The nurse also noted bruises on Walker's arms and legs. The emergency-room physician's notes state that Walker's chief complaint on admission was neck pain and that she also complained of amnesia. Walker's doctors performed a CT scan of her head and neck, which revealed a subarachnoid hemorrhagea brain aneurysm. Later that night, Walker was transferred to the University of Alabama at Birmingham hospital for treatment by a specialist.
During the next several months, Walker underwent at least three brain surgeries. She ultimately recovered, but has no memory of the events that occurred on July 28 and 29, 2002. Lab tests of Walker's blood taken upon her admission to Gadsden Regional Medical Center showed negative results for the presence of illegal drugs.

IV. Walker's Prosecution

Walker's trial on the DUI and standing-in-the-roadway charges was set for September 10, 2002. On September 9, 2002, Walker's counsel requested a continuance, stating that she had just been retained, *486 that she had a conflict on the trial date, and that Walker had been "diagnosed with a cerebral brain hemorrhage and [had been] hospitalized at University [of Alabama] Hospital in Birmingham in August" and was still under a doctor's care. The municipal court granted that continuance and the hearing was reset for November 19, 2002. On that date, the City requested a continuance pending an analysis of the pills Watkins had recovered from Walker's purse. The municipal court granted the City's request. On November 22, 2002, the Alabama Department of Forensic Sciences reported that the pills recovered from Walker's purse were noncontrolled caffeine pills. At the next hearing date, January 28, 2003, the municipal court dismissed the case. Walker's son, who was present at that hearing, testified that the prosecutor for the City wanted to proceed with the claims against Walker unless she released the City from liability.

V. Expert Witnesses

Walker and the defendants presented evidence from several expert witnesses. For purposes of this opinion, it is not necessary to discuss that evidence in detail. In summary, Walker's experts testified that the defendants breached the applicable standards for arrests, nursing, detention, and training; the defendants' experts testified that the defendants did not breach any applicable standard of care.

Standard of Review
"`The standard of review applicable to a summary judgment is the same as the standard for granting the motion....' McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957, 958 (Ala.1992).
"`A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present "substantial evidence" creating a genuine issue of material fact"evidence of such weight and quality that fairminded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).'
"Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala. 1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala. 2004)."
Alabama Elec. Coop. v. Bailey's Constr. Co., 950 So.2d 280, 283 (Ala.2006).

Analysis
As stated above, the trial court did not state its reasons for entering a summary judgment for the defendants. On appeal, Walker argues that the trial court erred in entering the summary judgment because, she says, her state-law claims are not barred by the doctrine of collateral estoppel, State-agent immunity, or municipal immunity, and because the defendants were guilty of spoliation. The defendants counter each of these arguments and also *487 argue that Walker's claims are not supported by substantial evidence.

I. Collateral Estoppel

The parties dispute whether Walker's state-law claims are barred under the doctrine of collateral estoppel based on the federal court's summary judgment for the defendants on Walker's § 1983 claims. This Court has stated:
"For the doctrine of collateral estoppel to apply, the following elements must be established:
"`"(1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions."
"`Smith v. Union Bank & Trust Co., 653 So.2d 933, 934 (Ala. 1995). "`Where these elements are present, the parties are barred from relitigating issues actually litigated in a prior [action].'" Smith, 653 So.2d at 934 (quoting Lott v. Toomey, 477 So.2d 316, 319 (Ala.1985)).'
"Biles v. Sullivan, 793 So.2d 708, 712 (Ala.2000). `Only issues actually decided in a former action are subject to collateral estoppel.' Leverette ex rel. Gilmore v. Leverette, 479 So.2d 1229, 1237 (Ala.1985) (emphasis added). The burden is on the party asserting collateral estoppel to prove that the issue it is seeking to bar was determined in the prior adjudication. See Adams v. Sanders, 811 So.2d 542, 545 (Ala.Civ.App. 2001) (`Because we have no transcript of the trial in the district court, the burden is on Sanders to show that the district court determined that he was not negligent.'). See also United States v. Cala, 521 F.2d 605, 608 (2d Cir.1975) (`The burden ... is on [the one asserting collateral estoppel] to establish that the issue he seeks to foreclose from litigation in the present prosecution was necessarily decided in his favor by the prior verdict.')."
Lee L. Saad Constr. Co. v. DPF Architects, P.C., 851 So.2d 507, 520 (Ala.2002).
The defendantsthe parties asserting collateral estoppelargue that the federal court determined that Watkins had probable cause to arrest Walker and that the defendants' conduct was reasonable. Accordingly, the defendants argue, collateral estoppel applies to bar relitigation of those issues and effectively decides certain elements of each of Walker's state-law claims in favor of the defendants. As a result, the defendants maintain, the trial court correctly entered a summary judgment in their favor.
Walker argues that collateral estoppel does not apply to any of her state-law claims because the federal court declined to exercise supplemental jurisdiction over those claims. She cites this Court's decision in Lloyd Noland Foundation, Inc. v. HealthSouth Corp., 979 So.2d 784 (Ala. 2007), and the Restatement (Second) of Judgments § 28 (1982). In Lloyd Noland, the trial court entered a summary judgment for HealthSouth based, in part, on the doctrine of collateral estoppel. In prior litigation, a federal court had interpreted a certain contract provision that HealthSouth contended was at issue in the plaintiff's state-law action. This Court determined that, because the plaintiff's state-law claims were based on a different contract and a different set of transactions than those at issue in the federal court, the issue decided by the federal court was "not identical to any of the issues to be addressed in the present litigation." 979 So.2d at 796. This Court then stated:

*488 "Furthermore, collateral estoppel is not applicable where the plaintiff was unable to seek a certain remedy or form of relief in the first action because of the limitations on the subject-matter jurisdiction of the courts. See Restatement (Second) of Judgments § 26 (1982). Collateral estoppel does not apply where it is `asserted in an action over which the court rendering the prior judgment would not have had subject matter jurisdiction.' Restatement (Second) of Judgments § 28(3) cmt. d (1982). `[A]fter a court has incidentally determined an issue that it lacks jurisdiction to determine directly, the determination should not be binding when a second action is brought in a court having such jurisdiction.' Restatement (Second) of Judgments § 28(3) cmt. d."
In Lloyd Noland, this Court determined, based on federal diversity rules, that the federal court could not have exercised supplemental jurisdiction over the plaintiff's state-law claims. As a result, the plaintiff was actually unable to seek a remedy in that court as to those claims, and this Court concluded that the doctrine of collateral estoppel did not apply.
The Restatement (Second) of Judgments § 28 (1982), relied on by Walker and by this Court in Lloyd Noland, states that, even where other elements of collateral estoppel are met, relitigation is not appropriate where: "A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them...." The comment explains:
"Not infrequently, issue preclusion will be asserted in an action over which the court rendering the prior judgment would not have had subject matter jurisdiction. In many such cases, there is no reason why preclusion should not apply; the procedures followed in the two courts are comparable in quality and extensiveness, and the first court was fully competent to render a determination of the issue on which preclusion is sought. In other cases, however, there may be compelling reasons why preclusion should not apply. For example, the procedures available in the first court may have been tailored to the prompt, inexpensive determination of small claims and thus may be wholly inappropriate to the determination of the same issues when presented in the context of a much larger claim. The scope of review in the first action may have been very narrow. Or the legislative allocation of jurisdiction among the courts of the state may have been designed to insure that when an action is brought to determine a particular issue directly, it may only be maintained in a court having special competence to deal with it. In such instances, after a court has incidently determined an issue that it lacks jurisdiction to determine directly, the determination should not be binding when a second action is brought in a court having such jurisdiction. The question in each case should be resolved in the light of the nature of litigation in the courts involved and the legislative purposes in allocating jurisdiction among the courts of the state."
Restatement (Second) of Judgments § 28 cmt. d (1982) (emphasis added).
In this case, the federal court expressly determined that it had supplemental jurisdiction over Walker's state-law claims based on 28 U.S.C. § 1367(a). It stated:
"[Walker's] amended complaint also contains a number of tort claims that sound in state law. This does not present any jurisdictional problems because, in cases where a federal district court's *489 jurisdiction is based solely upon the presence of a federal question, the court also possesses the discretion to entertain state claims that are so related to the federal causes of action that they form a part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(a). The district court may, however, decline to exercise supplemental jurisdiction when ... the district court has dismissed all claims over which it has original jurisdiction.... 28 U.S.C. § 1367(c)."
(Emphasis added.) Based on 28 U.S.C. § 1367(c), the federal court, within its discretion, declined to exercise supplemental jurisdiction over Walker's claims and remanded the action to the Madison Circuit Court.
This case is, therefore, procedurally distinguishable from Lloyd Nolandin which the federal court actually lacked jurisdiction over the plaintiff's claims. Likewise, this case is different from those situations identified in the Restatement in which there are "compelling reasons why preclusion should not apply," such as when "the procedures available in the first court may have been tailored to the prompt, inexpensive determination of small claims"; where "the scope of review in the first action [was] very narrow"; or where the first court determined issues collateral to the primary issues over which the legislature granted it jurisdiction. Walker has not argued that any such situations are present in this case. Accordingly, the federal court's decision to exercise discretion under § 1367(c) and to decline supplemental jurisdiction over state-law claims it could have decided does not preclude application of the doctrine of collateral estoppel to Walker's state-law claims.
Where the elements of collateral estoppel are satisfied, this Court has applied the doctrine to bar relitigation of issues decided by a federal court, even though the federal court, in its discretion, declined to exercise supplemental jurisdiction over claims it could have decided. In Roden v. Wright, 646 So.2d 605 (Ala.1994), the plaintiff sued the Marshall County Commission and its chairman, alleging that the chairman had wrongfully interfered with his business contract. The plaintiff stated claims under § 1983, alleging violations of the Fourteenth Amendment of the United States Constitution and his right to contract. The plaintiff also stated several state-law claims arising from the chairman's actions. The federal court denied the chairman's motion for a summary judgment based on federal principles of qualified immunity, and the chairman appealed the decision to the United States Court of Appeals for the Eleventh Circuit. The Eleventh Circuit reversed the federal district court's decision. On remand, the federal district court entered a judgment in favor of the defendants on the § 1983 claims and dismissed the state-law claims without prejudice.
The plaintiff in Roden then filed a complaint in the Marshall Circuit Court, alleging his state-law claims against the same defendants. Ultimately, the trial court granted the chairman's motion for a summary judgment, and the plaintiff appealed. This Court, on the chairman's argument, applied the doctrine of collateral estoppel, analyzing the federal court's decision and reasoning: "[A] comparison of the legal and factual questions involved in this action with those involved in Roden's § 1983 action reveals a factual issue that is common to both actions, that is, whether [the chairman's action] was a discretionary act taken within the scope of his authority." 646 So.2d at 610. Specifically, this Court stated: "Determining whether [the chairman] is entitled to good-faith immunity *490 from liability under [the plaintiff's] state-law claims requires resolution of the same issue involved in step one of the Eleventh Circuit's analysis." 646 So.2d at 610. Finding that the other elements of collateral estoppel were satisfied, this Court ultimately concluded that the doctrine of collateral estoppel barred relitigation of the question whether the chairman's actions were discretionary.
Similarly, in Lightfoot v. Floyd, 667 So.2d 56 (Ala.1995), the plaintiff sued several defendants in the Madison Circuit Court, alleging state-law claims and claims under § 1983. The action was removed to the federal court, which entered a summary judgment for the defendants on the § 1983 claims and remanded the state-law claims to the Madison Circuit Court. On remand, the defendants moved for a summary judgment on the state-law claims, asserting, in part, that certain questions at issue in the state-law claims should be barred by the doctrine of collateral estoppel. The circuit court granted the defendants' motions, and the plaintiff appealed. In a detailed analysis, this Court held that the doctrine of collateral estoppel did not apply to certain issues that had not actually been decided by the federal court but that it barred relitigation of other issues that were decided by the federal court.[3]
Walker states, without citing authority or elaborating, that her state-law claims arise out of the same facts as do her § 1983 claims but that "the rule of law is not the same." Walker also states, again without citing authority or explaining further, that "collateral estoppel should not apply across the board and bar Walker's claims that were not decided with the application of state law by the federal district court that subsequently declined to exercise supplemental jurisdiction and declined to rule on those issues." However, the critical question, as shown in Roden and Lightfoot, is whether the elements of collateral estoppel are satisfiedspecifically whether an identical issue has been presented, litigated, and decided by the federal court. Wright and Miller explain:
"Identification of differences in legal standards and ensuing differences in the issues of law application is apt to be particularly easy when different legal systems are involved. Federal courts have often found that questions presented by federal law are different from questions decided under foreign law or state law. Determination of a state-law issue may be particularly unsuited for preclusion when federal law applies independent constraints to the role of state law. And of course the laws of different states may give different meanings to the same legal terms, just as happens with federal and state law. At the same time, careful examination of the controlling legal principles may show that the standards are the same, or that the fact findings have the same effect under either standard, so that the same issue is presented by both systems of law. So long as the same issue is presented, preclusion is appropriate unless some special reason for relitigation arises from the nature of the relationship between federal courts and state or foreign courts."
18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice *491 and Procedure § 4417 (2d ed. 2002) (footnotes omitted; emphasis added) (citing Calhoun v. Franchise Tax Bd., 20 Cal.3d 881, 574 P.2d 763, 143 Cal.Rptr. 692 (1978) ("[T]he federal and state determinations of gross income [for purposes of federal and state income taxes] were sufficiently identical to warrant an estoppel.")). Therefore, so long as the elements of collateral estoppel are satisfied, the doctrine may apply. See Lee L. Saad Constr., 851 So.2d at 520.
Walker alleged six state-law claims based on arrest, detention, and prosecution. The federal court entered a summary judgment for the defendants on Walker's § 1983 claims based on an alleged unlawful arrest and excessive use of force in violation of the Fourth Amendment; an alleged unlawful denial of medical care in violation of the Fourteenth Amendment; and an alleged wrongful failure to train Department personnel to prevent the above violations. It is undisputed that the parties to the federal action and the state action are the same. The defendants argue that the federal court determined 1) that probable cause existed for Walker's arrest, 2) that the defendants' conduct was reasonable, and 3) that Watkins's use of force was reasonable and not excessive, and that these determinations prevent relitigation of issues that bar each of Walker's claims.

A. Probable Cause

In the federal court, the defendants raised the defense of qualified immunity. The federal court analyzed that defense using the two-step test stated in Andujar v. Rodriguez, 486 F.3d 1199, 1202-03 (11th Cir.2007):
"[C]ourts apply a two-step test to determine whether qualified immunity is appropriate. First ...: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?' Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). When a court answers this question affirmatively, the court moves to the second step, which is to consider whether the constitutional right was `clearly established' on the date of the violation. Id."
Regarding Walker's claim that her arrest violated Fourth Amendment protections against unreasonable searches and seizures, the federal court determined that her arresther seizurewas supported by probable cause and was therefore reasonable. Specifically, the federal court stated: "A warrantless arrest on a public street is reasonable and, therefore, lawful if it is supported by probable cause." The federal court defined probable cause, stating:
"[P]robable cause to effect an arrest exists if, at the moment the arrest was made, `the facts and circumstances [within the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the person arrested either had committed, or was in the process of committing an offense. Hunter v. Bryant, 502 U.S. 224, 228 (1991) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964))."
The federal court then examined the evidence presented by Walker and by the defendants and concluded:
"Here, plaintiff's outward symptoms and the surrounding circumstancese.g., the minor, one car accident, the pills located in plaintiff's purse, the absence of any obvious indication of serous injurieswould clearly suggest to a reasonable police officer that the plaintiff was either intoxicated or under the influence of some other substance. Indeed, both *492 police officers at the scene and both third-party witnesses were united in this belief. Therefore, ... the court is satisfied that Officer Watkins possessed actual probable cause to arrest plaintiff on suspicion of DUI."
As a result, the federal court concluded that Walker's arrest was not an unreasonable seizure. The defendants, therefore, were entitled to qualified immunity on Walker's § 1983 claim based on Fourth Amendment violations related to her arrest.
The question of probable cause, therefore, was actually litigated in the federal court and was necessary to its judgment regarding Walker's § 1983 claims. We must determine whether the question of probable cause under the federal court's analysis is identical to the issue to be determined in Walker's state-law claims.
Three of Walker's claims require proof of probable cause: malicious-prosecution, false imprisonment, and false arrest. Walker's malicious prosecution claim relates to her arrest and to the City's prosecution of the charges against her. As an element of this claim, Walker must show that "the defendant[s] acted without probable cause and with malice." Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 174 (Ala.2000). In Wal-Mart Stores, this Court stated:
"In malicious prosecution cases, `probable cause' is defined as `such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty.' Delchamps, Inc. v. Morgan, 601 So.2d 442, 445 (Ala. 1992) (citation omitted). Thus, the determination of probable cause does not hinge upon whether [the plaintiff] was in fact guilty ..., but whether [the defendant's] subjective belief under the circumstances led her to believe that [the plaintiff] was guilty."
789 So.2d at 174. In substance, this question is identical to that decided by the federal court regarding the existence of probable cause for Walker's arrest. Accordingly, the doctrine of collateral estoppel bars relitigation of that issue, and Walker's malicious-prosecution claim is barred to the extent it relates to her arrest. However, because the federal court decided the question of probable cause only as it related to Walker's arrest, collateral estoppel does not preclude litigation of that claim as it relates to the City's prosecution of the charges against her.
Walker's false-imprisonment claim relates to her arrest and detention. Section 6-5-170, Ala.Code 1975, defines false imprisonment as "the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." In Upshaw v. McArdle, 650 So.2d 875 (Ala.1994), this Court upheld a summary judgment for a defendant on a claim of false imprisonment related to an arrest because probable cause existed for the arrest and, therefore, the detention was not unlawful. For purposes of the false-imprisonment claim, this Court stated: "`"Probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonable trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed."'" 650 So.2d at 878 (quoting Bush v. State, 523 So.2d 538, 543 (Ala.Crim.App.1988), quoting in turn Knight v. State, 346 So.2d 478, 481 (Ala.Crim.App.1977)). This question is also identical to that decided by the federal court. Accordingly, the doctrine of collateral estoppel bars relitigation of the issue, and Walker's false-imprisonment claim stemming from the arrest is barred.
*493 Finally, Walker's claim of false arrest requires proof "that the defendant caused [her] to be arrested without probable cause." Higgins v. Wal-Mart Stores, Inc., 512 So.2d 766 (Ala.1987), overruled on other grounds, Drill Parts & Serv. Co. v. Joy Mfg. Co., 619 So.2d 1280 (Ala.1993). For purposes of false arrest, this Court has stated of probable cause:
"Thus, for a detention to be valid, the officer must reasonably, and in good faith, suspect the individual detained of being involved in some form of criminality. Fennell v. State, 51 Ala.App. 23, 282 So.2d 373, cert. denied, 291 Ala. 778, 282 So.2d 379 (1973). Reasonable ground for belief of guilt, or probable cause, `exists where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed.' Fennell, 51 Ala.App. at 29, 282 So.2d at 378."
Higgins, 512 So.2d at 768. The question of probable cause for purposes of Walker's claim of false arrest is, therefore, identical to that decided by the federal court. As a result, the doctrine of collateral estoppel bars relitigation of the issue, and Walker's false-arrest claim is barred.
The defendants argue that the federal court's finding of probable cause also bars Walker's invasion-of-privacy claim. However, that claim relates to the City's prosecution of Walker after it received notice of her medical condition. The federal court's finding of probable cause related only to Walker's arrest. Accordingly, the issues are not identical, and the doctrine of collateral estoppel does not bar Walker's invasion-of-privacy claim.

B. Reasonableness

The defendants next argue that the federal court determined that their conduct was reasonable and, therefore, that the doctrine of collateral estoppel bars Walker's claims of negligence and the tort of outrage because those claims require a finding of unreasonable and outrageous behavior, respectively. However, a close examination of the federal court's decision shows that it actually determined that Walker's arresther being taken into custodywas supported by probable cause and, therefore, that it was not an unreasonable seizure under the Fourth Amendment. Walker's negligence claim is based on her arrest, her 24-hour detention without medical care, and the City's and Chief Owens's alleged negligent failure to supervise and train Department employees. As to Walker's arrest and detention, she alleges that Watkins, Rosser, the detention officers, and, vicariously, the City, were negligent in not recognizing her medical symptoms and in not providing her with medical treatment. Accordingly, Walker must show that these defendants breached a duty to provide her medical treatment and that that breach proximately caused her injury or damage. See Ex parte Wild Wild West Social Club, Inc., 806 So.2d 1235, 1239-40 (Ala.2001). The federal court's inquiry regarding reasonableness under the Fourth Amendment is a different issue from the defendants' reasonableness in failing to provide Walker with medical care. Similarly, Walker's state-law claim of negligent training and supervision relates to the provision of medical care both at the time of her arrest and her subsequent detention. The federal court determined that Walker's § 1983 claim against Chief Owens and the City based on a failure to train and supervise with respect to the arrest was precluded because probable cause existed for the arresta different issue. Accordingly, the doctrine of collateral estoppel does not bar Walker's negligence claim.
*494 Walker bases her tort-of-outrage claim on her detention and subsequent prosecution. Walker's claim, therefore, presents different issues than those decided by the federal court regarding the reasonableness of Walker's arrest under the Fourth Amendment. Accordingly, the doctrine of collateral estoppel does not bar Walker's tort-of-outrage claim.

C. Use of Force

The defendants argue that Walker is collaterally estopped from pursuing her assault and battery claim based on the federal court's determination that Watkins's use of force was not excessive and, therefore, did not violate the Fourth Amendment. The federal court based its determination on federal precedent that allows the use of reasonable or de minimus force during an arrest, citing Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003); Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir.2000); and Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir.1997). Walker's complaint very generally states an assault and battery claim against all defendants. The only evidence relating to that claim relates to Watkins's use of force during Walker's arrest.
"The plaintiff in an action alleging assault and battery must prove `(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'" Harper v. Winston County, 892 So.2d 346, 353 (Ala.2004) (quoting Ex parte Atmore Cmty. Hosp., 719 So.2d 1190, 1193 (Ala.1998)). However, this Court has stated: "In making the arrest, a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest." Franklin v. City of Huntsville, 670 So.2d 848, 852 (Ala.1995), citing § 13A-3-27(a), Ala.Code 1975 ("A peace officer is justified in using that degree of physical force which he reasonably believes to be necessary, upon a person in order: (1) To make an arrest for a misdemeanor, violation or violation of a criminal ordinance ... unless the peace officer knows that the arrest is unauthorized.").
The issue decided by the federal court is, therefore, identical to the issue raised by Walker's assault and battery claim. The issue was actually determined by the federal court and was necessary to its judgment on Walker's § 1983 claim alleging an excessive use of force. Therefore, the doctrine of collateral estoppel bars relitigation of this issue and, as a result, Walker's assault and battery claim.
The trial court, therefore, correctly entered a summary judgment on Walker's claims of malicious prosecution and false imprisonment to the extent they relate to Walker's arrest and on Walker's claims of false arrest and assault and battery. The doctrine of collateral estoppel does not preclude litigation of any issues related to Walker's claims of 1) malicious prosecution; 2) negligence regarding Walker's arrest and detention without medical care and the City's and Chief Owens's failure to train and supervise; 3) the tort of outrage regarding Walker's detention and prosecution; and 4) invasion of privacy regarding Walker's prosecution.

II. Spoliation

Walker contends that the trial court erred in entering a summary judgment on her claims because, she says, the defendants were guilty of spoliation and she was therefore entitled to adverse inferences *495 of fact against them.[4] This Court has stated:
"Spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party's adversary. May v. Moore, 424 So.2d 596, 603 (Ala. 1982). Proof of spoliation will support an inference of guilt or negligence. May, 424 So.2d at 603. One can prove spoliation by showing that a party purposefully or wrongfully destroyed a document that the party knew supported the interest of the party's opponent. Id."
Wal-Mart Stores, 789 So.2d at 176 (concluding that Wal-Mart was not entitled to a new trial based on spoliation because "nothing in the record show[ed] that [the plaintiff] knew that the [allegedly spoliated evidence] would be a key piece of evidence in her case, and Wal-Mart provided no evidence to show that [the plaintiff] intentionally destroyed [it] in order to inhibit Wal-Mart's case."). See also Williams v. Michelin Tire Corp., 496 So.2d 743, 746 (Ala.1986) ("Plaintiffs also contend that the defendants purposely and wrongfully destroyed the tire. We are of the opinion that plaintiffs have failed to offer one shred of evidence that the tire was destroyed wrongfully. . . . [P]laintiffs have failed to offer any proof that anyone from [United Parcel Service, Inc.,] destroyed the tire to keep it from being used as evidence. Such naked allegations, without more, will not render the trial court's summary judgments improper.").
Walker, citing Vesta Fire Insurance Corp. v. Milam & Co. Construction, Inc., 901 So.2d 84 (Ala.2004), argues that, "as to the culpability issue, it is a reasonable-person test as to what the spoliator knew or `should have known' before disposing of the evidence." In Vesta, this Court applied the standards stated above and, as part of a detailed analysis, stated:
"The defendants do not argue that Vesta and Wausau acted with malicious intent in deciding what evidence to preserve, and the record, when viewed most favorably to Vesta and Wausau ... reflects at most honest error in judgment and/or simple negligence. There is no showing that they allowed evidence that they knew, or should have known, would be favorable to the opposing parties in foreseeable litigation to be discarded. Classic spoliation involves the idea that the offending party `purposefully and wrongfully' destroyed evidence `he knew was supportive of the interest of his opponent.'"
901 So.2d at 96 (quoting May, 424 So.2d at 603). Nothing in this language suggests the availability of an inference contrary to the alleged spoliator on the issue of liability when the loss or destruction of the evidence is shown to be merely an act of negligence inconsistent with the standards of conduct expected of a reasonable person acting under similar circumstances.
In her principal brief on appeal, Walker argues generally that the defendants destroyed "jail records," "jail logs," and "numerous records." However, she specifically identifies only: 1) records showing the identity of the jail nurse on duty during Walker's detention; 2) the City's contract with a local hospital to obtain nursing services; 3) a medical questionnaire signed by Walker; and 4) a written record of the jail nurse's examination of Walker. The defendants argue primarily that Walker has not shown that this evidence ever existed. Similarly, the federal court, in addressing *496 Walker's allegations of spoliation as it related to her § 1983 claims, noted significant questions as to whether the evidence ever existed and whether it was material to Walker's claims.
During the discovery process, three individuals who may have served as the jail nurse at the time of Walker's detention were found; however, none was positively identified as the nurse at the time. It is undisputed that Walker requested a copy of the contract that allegedly existed between the City and a local hospital regarding the jail nurse, but that neither the City nor the hospital could locate any such contract. One witness testified that Walker would have signed a copy of her medical questionnaire; however, another witness testified that the jail created and maintained only electronic copies of the record Walker sought. The witness who had once served as a jail nurse testified that inmate medical records were kept in filing cabinets in an exam room at the jail. However, she also testified that she did not always make written records of her contact with the inmates.
It is undisputed that the City has a duty to maintain its records. See §§ 36-12-2 and 41-13-23, Ala.Code 1975. It is also undisputed that on February 1, 2003, the administration of the jail was transferred from the City to Madison County. One witness described the transfer as "chaotic." Huntsville Police Lieutenant Sherry Jackson testified that she personally searched the Department's records, the jail records that were stored separately after the transfer, and the Department's electronic records for information relating to Walker. Lt. Jackson testified that she did not find anything the defendants had not already produced to Walker's counsel.
There is no evidence in the record showing that the defendants destroyed evidence purposefully or wrongfully or that the defendants knew that the evidence allegedly destroyed supported Walker's interests. See Wal-Mart Stores and Williams, supra. Accordingly, Walker has not shown spoliation on the part of the defendants that would render the trial court's entry of a summary judgment improper.

III. Immunity

The defendants argue that they are immune from liability on Walker's state-law claims under §§ 6-5-338 and 11-47-190, Ala.Code 1975. Section 6-5-338(a) states, in part: "Every peace officer, ... shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Section 11-47-190 applies to municipalities; it states, in part: "No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty...."
This Court has stated: "The restatement of State-agent immunity as set out in [Ex parte] Cranman, 792 So.2d [392,] 405 [(Ala.2000)], now governs the determination of whether a peace officer is entitled to immunity under § 6-5-338(a)." Ex parte City of Tuskegee, 932 So.2d 895, 904 (Ala.2005). This Court in Cranman stated the test for State-agent immunity as follows:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or

*497 "(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
Cranman, 792 So.2d at 405. In Hollis v. City of Brighton, 950 So.2d 300, 309 (Ala. 2006), this Court modified category (4) of the Cranman test to state: "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala.Code 1975."
"Additionally, this Court has stated:
"`This Court has established a "burden-shifting" process when a party raises the defense of State-agent immunity. Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity. Giambrone, 874 So.2d at 1052; Ex parte Wood, 852 So.2d 705, 709 (Ala.2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. Giambrone, 874 So.2d at 1052; Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala.1998). "A State agent acts beyond authority and is therefore not immune when he or she `fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" Giambrone, 874 So.2d at 1052 (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala.2000)).'
"Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006)."
Ex parte Yancey, 8 So.3d 299, 305 (Ala. 2008).

A. Officer Watkins and Officer Rosser

The only claim against Watkins and Rosser that survives our analysis of *498 the availability of the doctrine of collateral estoppel is Walker's claim of negligence relating to their failure to recognize her symptoms at the time of her arrest and their failure to obtain medical treatment for her. It is undisputed that Watkins and Rosser are State agents. Watkins and Rosser argue that their actions fall within the fourth (as modified by Hollis) and fifth categories identified by Cranman: "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a)" and "exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students." See Cranman and Hollis, supra.
Chief Owens testified that, in making DUI arrests, the Department's police officers like Watkins and Rosser based the decision to arrest on their observations and experience. A written directive of the Department stated: "Any prisoner who is injured prior to or during an arrest will not be transported to the City detention facility until he/she has been transported to and offered treatment at an approved medical facility." The directive defined the term "injury" as a broken bone, a cut requiring stitches, or "any other injury or condition a supervisor or detention facility officer determines must be treated." Chief Owens testified that the decision to transport an individual to the hospital instead of to jail lies with the arresting officer. He also testified that there was no directive or guideline, other than that stated above, detailing when an officer should transport an individual to the hospital instead of the jail.[5]
Based on this evidence, it is apparent that, in determining whether Walker needed medical attention, Watkins and Rosser were not discharging duties pursuant to detailed rules, regulations, or checklists. See Yancey, supra. They were, instead, exercising judgment with respect to Walker's arrest and performing a discretionary function in the line and scope of their law-enforcement duties within the meaning of § 6-5-338. Watkins and Rosser, therefore, have shown that they are entitled to State-agent immunity under the fourth area identified in Cranman.
The burden then, shifts to Walker to present evidence indicating that Watkins and Rosser acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority. No evidence in the record shows that they did so. Accordingly, Walker has not met her burden, and Watkins and Rosser are immune from liability on Walker's negligence claim relating to their failure to recognize her symptoms at the time of her arrest and their failure to obtain medical treatment for her.

B. The City's Liability for the Conduct of Officer Watkins and Officer Rosser

This Court has stated: "under principles of vicarious liability, where a municipal employee enjoys immunity, the municipality likewise is immune as to claims based on the employee's conduct." City of Bayou La Batre v. Robinson, 785 *499 So.2d 1128, 1131 (Ala.2000). Therefore, because Watkins and Rosser are immune, the City is also immune from liability on Walker's claims against it based on their acts. The trial court, therefore, correctly entered a summary judgment in favor of Watkins, Rosser, and the City as to Walker's claims related to the failure of its employees, Watkins and Rosser to recognize her symptoms at the time of her arrest and their failure to obtain medical treatment for her.

C. Chief Owens

The only claim remaining against Chief Owens is a claim alleging that he negligently failed to train and supervise Department employees including Watkins, Rosser, and the jail personnel. It is undisputed that Chief Owens is a State agent for purposes of the Cranman analysis. Walker's claims relate directly to Chief Owens's "formulating plans, policies, or designs;" and "exercising his ... judgment in the administration of a department or agency of government, including, but not limited to, ... hiring, firing, transferring, assigning, or supervising personnel"; therefore, Chief Owens's actions fall squarely within the first two categories identified in Cranman. Chief Owens has, therefore, shown that he is entitled to immunity. The burden then shifts to Walker to show that Chief Owens acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority. No evidence in the record supports such a finding. Accordingly, Chief Owens is immune from liability on Walker's claim against him for negligence in failing to train or supervise Department employees. The trial court, therefore, correctly entered a summary judgment in favor of Chief Owens on Walker's claim of negligent failure to train and/or supervise.

D. The City's Liability for the Conduct of Chief Owens

As a result of our determination that Chief Owens is immune from liability on Walker's claim against him alleging negligence in failing to train or supervise Department employees, the City likewise is immune from liability on Walker's claims based on Chief Owens's conduct. See City of Bayou La Batre. The trial court, therefore, correctly entered a summary judgment in favor of the City on Walker's claim alleging Chief Owens's negligent failure to train and/or supervise.

E. The City's Liability for Acts of Detention Personnel

Walker asserts additional claims against the City based on the acts of the detention officers and the jail nurse on duty during Walker's detention. Regarding the detention officers and the jail nurse, Walker argues that the trial court erred in considering the City's second motion for a summary judgment addressing the claims related to them because, she argues, the motion was untimely. The parties dispute whether that second motion related to a new issue raised in Walker's reply to the City's first motion for a summary judgment or to issues Walker had previously argued. In any event, the transcript of the summary-judgment hearing shows that, although Walker objected, her counsel responded to the substance of the City's arguments. Additionally, the trial court twice asked Walker's counsel whether she wanted more time to respond in writing to the City's second motion, but Walker's counsel did not respond affirmatively. In its order, the trial court concluded that Walker "had adequate time to address the issues in the [City's] second motion for summary judgment and had *500 amply addressed those same issues in her opposition brief filed [previously]."
This Court has stated:
"It is ... well settled `that a party may not induce an error by the trial court and then attempt to win a reversal based on that error. "A party may not predicate an argument for reversal on `invited error,' that is, `error into which he has led or lulled the trial court.'"' Mobile Infirmary Med. Ctr. v. Hodgen, 884 So.2d 801, 808 (Ala.2003) (quoting Atkins v. Lee, 603 So.2d 937, 945 (Ala. 1992), quoting in turn Dixie Highway Express, Inc. v. Southern Ry., 286 Ala. 646, 651, 244 So.2d 591, 595 (1971))."
White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1057 (Ala.2008). If the trial court erred in considering the City's second summary-judgment motion, Walker invited that error by failing to ask the trial court for more time to respond when she had the opportunity to do so. We will not reverse the trial court's judgment on this ground.
We note that Walker did not name either the detention officers or the jail nurse as defendants in this action. However, this Court has stated:
"The vicarious liability of a putative master under the rule of respondeat superior depends upon the liability of the putative servant. See Larry Terry Contractors, Inc. v. Bogle, 404 So.2d 613, 614 (Ala.1981) ...; Franklin v. City of Huntsville, 670 So.2d 848 (Ala.1995) (holding that a city could not be held vicariously liable for the act of a magistrate who was immune from liability). Thus, if a putative servant is not liable, either because he is innocent or because he is immune, no liability exists to be visited upon the putative master under the rule of respondeat superior. Id."
Hollis, 885 So.2d at 141-42. See also City of Bayou La Batre, supra. Therefore, because the liability of a master, in this case the City, is contingent on the liability of its servants, i.e., the detention officers and the jail nurse, we will consider whether those agents would be entitled to State-agent immunity under Cranman if they had been named as defendants.

1. The Detention Officers

Walker alleges against the City claims of negligence, and the tort of outrage based on the acts of the detention officers, specifically based on the detention officers' failure to provide Walker with medical care. Walker argues that the detention officers are not peace officers within the meaning of § 6-5-338(a), Ala.Code 1975, because, she argues, they were not police officers and did not have the powers listed in § 6-5-338(a).[6] To support this *501 argument, Walker relies on Ex parte Shelley, 53 So.3d 887 (Ala.2009), and Howard v. City of Atmore, 887 So.2d 201 (Ala. 2003).
In Shelley, this Court determined that a sheriff's jailer was not entitled to State immunity as an alter ego of a constitutional officer under § 14 of the Alabama Constitution of 1901. This Court did not address whether a municipal detention officer may be entitled to State-agent immunity under Cranman. Therefore, this Court's decision in Shelley has no bearing on the question Walker presents in this case.
In Howard, this Court determined that a city police officer who was working as a "jailer/dispatcher" was performing law-enforcement duties. In a footnote, this Court expressly declined to answer the question "whether the immunity afforded by § 6-5-338(a) applies to a city-jail guard who is not a regular municipal police officer." 887 So.2d at 204 n. 1. We now hold that a municipal jailer who lacks the authority of a police officer cannot claim immunity under concepts applicable to the immunity of a State agent under § 6-5-338(a), which requires that the individual be "empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state." The detention officers in this proceeding, unlike the jailer in Howard, did not, according to the evidence before us, have such authority. We conclude that the detention officers at the City's jail are not entitled to immunity as peace officers under § 6-5-338(a) or as State agents under Cranman.

2. The Jail Nurse

Walker asserts a claim of negligence against the City based on the actions of the jail nurse. The defendants argue that the jail nurse is entitled to State-agent immunity under Cranman. Walker argues that the jail nurse was not entitled to State-agent immunity, citing Wilson v. Manning, 880 So.2d 1101 (Ala. 2003). Although there was some question regarding whether the jail nurse was employed by the City or by a local hospital, none of the evidence in the record shows that the jail nurse was an employee of the State. The record on appeal contains little evidence regarding the duties of the jail nurse. Of that evidence, nothing shows that the jail nurse was employed or appointed as a peace officer or that he or she exercised the duties of a peace officer identified in § 6-5-338(a), such as the enforcement of or the investigation of criminal laws. See note 6, supra. The jail nurse, therefore, was not a State employee, nor was he or she an officer of the State under 6-5-338. Accordingly, the jail nurse is not entitled to immunity as a peace officer under § 6-5-338(a) or as a State agent under Cranman.

F. Additional Claims Against the City

Walker asserts three final claims against the City: malicious prosecution, the tort of outrage, and invasion of privacy, all based on the City's continued prosecution of Walker after she provided proof of her medical condition. All three claims alleging intentional torts are barred under § 11-47-190, which limits the liability of a municipality to injuries "suffered through the neglect, carelessness, or unskillfulness of some agent."
In Neighbors v. City of Birmingham, 384 So.2d 113 (Ala.1980), this Court held that a city could not be held liable for malicious prosecution. The Court reasoned: "Section 11-47-190 remains the pertinent legislative enactment. It limits the liability of municipalities to injuries *502 suffered through `neglect, carelessness or unskillfulness.' To construe that language to include an action for malicious prosecution would be to expand the words beyond their normal meaning. This we decline to do." 384 So.2d at 114. This Court expressly affirmed that holding in Franklin v. City of Huntsville, 670 So.2d 848, 852 (Ala.1995) ("This court therefore affirms the holding of Neighbors . . . that a municipality is immune from a malicious prosecution claim. . . ."). Accordingly, under § 11-47-190, the City cannot be held liable on Walker's claim of malicious prosecution, and the trial court correctly entered a summary judgment for the City on that claim.
Regarding the tort of outrage, this Court has stated:
"In order to recover, a plaintiff must demonstrate that the defendant's conduct `(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.' Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38, 44 (Ala. 1990)"
Potts v. Hayes, 771 So.2d 462, 465 (Ala. 2000). The tort of outrage is, therefore, an intentional tort. Because the City, under § 11-47-190, may be liable only for acts of neglect, carelessness or unskillfulness, the trial court correctly entered a summary judgment for the City on Walker's tort-of-outrage claim.
Finally, it is undisputed that Walker's claim of invasion of privacy is based on the City's allegedly putting her in a false light by proceeding with its prosecution of her.
"This Court has stated the following regarding a claim of invasion of privacy by putting one in a false light:
"`"`One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
"`"`(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
"`"`(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'"'
"Butler v. Town of Argo, 871 So.2d 1, 12 (Ala.2003) (quoting Schifano v. Greene County Greyhound Park, Inc., 624 So.2d 178, 180 (Ala.1993), quoting in turn Restatement (Second) of Torts § 652E (1977))."
S.B. v. Saint James School, 959 So.2d 72, 79 (Ala.2006) (emphasis added). Because this claim requires proof that the City's agent acted knowingly or recklessly, it also falls outside those acts of neglect, carelessness, or unskillfulness for which the City may be liable under § 11-47-190. Accordingly, the trial court correctly entered a summary judgment in the City's favor on this claim as well.
Based on the foregoing, the City is not immune from liability on Walker's claim against it based on the alleged negligence of the jail nurse. However, Walker's remaining claims against the City, Chief Owens, and Officers Watkins and Rosser are barred under the doctrines of State-agent and municipal immunity, and the trial court correctly entered a summary judgment on those claims.

IV. Sufficiency of the Evidence as to Claims Not Barred by Immunity

The trial court entered a summary judgment on all claims, including Walker's claim against the City based on the alleged negligence of the detention officers and the jail nurse. Because, as previously noted, *503 the City is not entitled to assert the defense of immunity as to claims stemming from the conduct of the detention officers and the jail nurse, resolution of the appeal as to this claim involves substantive principles of tort law.
In her principal brief on appeal, Walker fails to cite authority regarding the substantive principles of tort law applicable to her claimeither general principles of negligence applicable to the detention officers or more specific principles of medical negligence as might be applicable to the jail nurse. Walker cites cases for the proposition that mental-anguish damages are available to her. See Slack v. Stream, 988 So.2d 516 (Ala.2008), and Horton Homes, Inc. v. Brooks, 832 So.2d 44 (Ala. 2001). However, she cites no authority to support the antecedent proposition that the detention officers and the jail nurse are liable to her for such damages.[7]
This Court has stated:
"Rule 28(a)(10), Ala. R.App. P., requires that arguments in an appellant's brief contain `citations to the cases, statutes, other authorities, and parts of the record relied on.' Further, `it is well settled that a failure to comply with the requirements of Rule 28(a)(10) requiring citation of authority in support of the arguments presented provides this Court with a basis for disregarding those arguments.' State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 822 (Ala.2005) (citing Ex parte Showers, 812 So.2d 277, 281 (Ala.2001)). This is so, because `"it is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument."' Butler v. Town of Argo, 871 So.2d 1, 20 (Ala. 2003) (quoting Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994))."
Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala.2007) (emphasis added). Walker has not supported her arguments regarding the sufficiency of the evidence of her negligence claim with citation to authority as required by Rule 28, Ala. R.App. P. Accordingly, Walker has not shown that the trial court erred in entering a summary judgment as to her claim against the City for the alleged negligence of the detention officers and the jail nurse.

Conclusion
Based on the foregoing, the trial court correctly entered a summary judgment for the defendants as to all of Walker's state-law claims. We, therefore, affirm the trial court's judgment.
AFFIRMED.
COBB, C.J., and WOODALL, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs in the rationale in part and concurs in the result.
MURDOCK, Justice (concurring in the rationale in part and concurring in the result).
I concur in the result reached by the main opinion in all respects. I concur in all respects with the rationale stated in the *504 main opinion except as to the issue discussed in Part III.A. of the analysis section of the opinion. See Ex parte Monroe County Bd. of Educ., 48 So.3d 621, 630-32 (Ala.2010) (Murdock, J., concurring in part and dissenting in part); Ex parte Watson, 37 So.3d 752, 765 (Ala.2009) (Murdock, J., concurring in part and dissenting in part).
NOTES
[1] "A person shall not drive or be in actual physical control of any vehicle while: ... (5) Under the influence of any substance which impairs the mental or physical faculties of such person to a degree which renders him or her incapable of safely driving." § 32-5A-191(a), Ala.Code 1975.
[2] "Except when necessary to avoid conflict with other traffic, or in compliance with law or the directions of a police officer or official traffic-control device, no person shall: (1) Stop, stand or park a vehicle: a. On the roadway side of any vehicle stopped or parked at the edge or curb of a street; ... c. Within an intersection...." § 32-5A-137(a), Ala.Code 1975.
[3] We note that dicta in Matthews v. Alabama A & M, 787 So.2d 691, 696 (Ala.2000), indicates that there can never be collateral estoppel or issue preclusion in a subsequent state-court proceeding when the federal court in a prior action declines to exercise supplemental jurisdiction over state-law claims. None of the parties has cited Matthews, and we decline to follow its dicta because it fails to consider Roden, Lightfoot, and the sound reasoning set forth in Restatement (Second) of Judgments, § 28, quoted above.
[4] We here deal with spoliation as the basis for an inference of guilt or negligence and not the separate doctrine of spoliation as the basis for a cause of action. See, e.g., Smith v. Atkinson, 771 So.2d 429 (Ala.2000).
[5] In her principal brief on appeal, Walker argues that Watkins violated the Department's written directive No. 101-13 regarding the use of force. However, that directive has not been made a part of the record on appeal. Additionally, it is not material to the facts upon which Walker bases her negligence claim, i.e., Watkins's failure to provide her with medical care.
[6] Section 6-5-338(a) states in full:

"Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."
(Emphasis added.)
[7] In her reply brief, Walker cites two cases regarding the general proposition that the existence of proximate causation is generally a question for a jury: Swanstrom v. Teledyne Continental Motors, Inc., 43 So.3d 564 (Ala. 2009), and Norris v. City of Montgomery, 821 So.2d 149 (Ala.2001). However, we do not consider the argument presented for the first time in the reply brief. See Lloyd Noland Hosp. v. Durham, 906 So.2d 157, 173 (Ala. 2005) ("It is a well-established principle of appellate review that we will not consider an issue not raised in an appellant's initial brief, but raised only in the reply brief.").